[No. D060570. Fourth Dist., Div. One. Feb. 7, 2013.]

CANDACE CATES, Plaintiff and Respondent, v.
JOHN CHIANG, as State Controller, etc., et al., Defendants and Appellants.

794

## COUNSEL

Kamala D. Harris, Attorney General, Sara J. Drake, Assistant Attorney General, and T. Michelle Laird, Deputy Attorney General, for Defendants and Appellants.

Law Offices of Martin N. Buchanan, Martin N. Buchanan; Legion Counsel, Mark A. Bush; Thomas E. Sharkey and James E. Chodzko for Plaintiff and Respondent.

## OPINION

**HALLER, Acting P. J.**—In 2003, Candace Cates brought a taxpayer action against several defendants, including the California Gambling Control Commission (Commission) and California's State Controller (Controller), alleging these entities had failed to discharge their mandatory statutory duties to collect money derived from gambling owed to the state by various Indian tribes. After Cates engaged in independent investigation and discovery and the court ruled on numerous motions, the trial court granted summary judgment in defendants' favor.

In 2007, this court reversed the summary judgment, finding defendants did not show they complied with their mandatory duties to collect the portion of gambling revenue owed to the state. (*Cates v. California Gambling Control Com.* (2007) 154 Cal.App.4th 1302 [65 Cal.Rptr.3d 513] (*Cates I*).) In reaching our conclusions, we found "troubling" the commissioners' testimony showing the Commission was not conducting the necessary oversight to determine whether delinquencies existed under the applicable standards. (*Id.* at p. 1311.) We stated that it "appears from the evidence" the Commission is "simply verifying the accuracy of [the tribes'] mathematical calculations," rather than complying with its legal duty to confirm that the tribes are paying the required amounts. (*Ibid.*)

After the case was remanded to the trial court, the Commission completed audits of all the affected tribes and determined the tribes had underpaid the state by about $12.8 million, and the Commission collected at least $11.5 million of this amount. Based on the Commission's audits and its collection of the delinquent funds, Cates was satisfied the Commission was complying with its mandatory duties and dismissed her substantive causes of action. As part of the dismissal, the parties stipulated the court would decide issues pertaining to Cates's entitlement to attorney fees and the reasonable amount of any such fees in bifurcated proceedings.

In the entitlement phase, Cates sought attorney fees under Code of Civil Procedure section 1021.5 (section 1021.5), arguing her lawsuit was a "catalyst" that caused a change in defendants' conduct and vindicated an important public interest. (See *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553 [21 Cal.Rptr.3d 331, 101 P.3d 140] (*Graham*).) Specifically, Cates asserted that her lawsuit prompted the Commission to enforce proper standards for calculating amounts owed by the tribes and to identify and collect millions of dollars in gambling revenues owed by the tribes. After examining the parties' extensive written submissions and conducting a lengthy hearing, the court (Judge David Oberholtzer) ruled that Cates met her burden to show the elements necessary to recover against the Commission and the Controller on a section 1021.5 catalyst theory, including that her lawsuit was a substantial factor in causing these entities to properly enforce and collect the tribes' substantial delinquencies.

The matter was then reassigned to Judge William Dato for the second phase of the litigation pertaining to the amount of recoverable attorney fees incurred in the six-year litigation. After examining the submitted documentation and legal memoranda, and conducting a hearing, the court awarded $2,011,844, which reflected a lodestar of $1,087,483 (2,398 attorney hours at a $451 blended hourly rate, plus paralegal hours) and a 1.85 positive multiplier. This amount was substantially less than the fees requested by Cates, and was substantially more than that advocated by defendants.

On appeal, the Commission and Controller challenge the court's rulings on the entitlement and amount of attorney fees. On entitlement, they contend the court erred in granting attorney fees under the catalyst theory because there was insufficient evidence showing the lawsuit *caused* the public agencies to provide the primary relief sought in the lawsuit and because Cates did not make a reasonable attempt to settle the litigation before filing suit. We reject these arguments as to the Commission, but find there is insufficient evidence in the record to show the lawsuit was a catalyst as to the Controller.

On the amount issue, we conclude the court's lodestar determinations were within the court's discretion. We reject the Commission's evidentiary challenges to the reconstructed attorney time records. These challenges go to the weight of the evidence and not to its admissibility. The court had sufficient information to evaluate the reliability of the submitted records.

We further conclude the court acted within its discretion in applying the positive multiplier with respect to the attorney fees incurred to prove the merits of Cates's claims and to establish entitlement to the fees on a catalyst theory. Under the deferential review standard, the court's reliance on the contingent risk factor to enhance these fees was reasonable under the circumstances. However, we determine there was an insufficient basis for the court to award a multiplier on the attorney fees incurred to litigate the appropriate amount of the fee award. As explained, there was no contingent risk associated with this issue, except for the risk created by Cates's own attorneys. We thus remand for the court to strike this enhanced amount from the attorney fees award.

Accordingly, as to the Controller, we reverse the orders in their entirety. As to the Commission, we affirm the order determining that Cates proved she was entitled to attorney fees under a section 1021.5 catalyst theory, but reverse the order establishing the amount of the award with specific directions set forth in the Disposition portion.

### FACTUAL AND PROCEDURAL SUMMARY

#### A. *Background*[1]

In 1997, the Legislature created the Commission, an independent agency charged with regulating and setting gambling policy in California. (Bus. & Prof. Code, § 19800 et seq.) The Commission is governed by five members (Commissioners) appointed by the Governor subject to confirmation by the state Senate. (Bus. & Prof. Code, § 19811.)

---

[1] A more detailed background is contained in our prior opinion, *Cates I, supra,* 154 Cal.App.4th 1302.

Two years later, the State of California and various California Indian tribes executed a Tribal-State Gaming Compact (Compact), permitting the tribes to operate public gambling casinos on their respective California reservations. (*Cates I, supra*, 154 Cal.App.4th at p. 1305.) The Compact requires the tribes to pay a percentage of their gambling revenues to a special state fund (Fund), and to submit quarterly contribution reports regarding the required payments. (See Gov. Code, § 12012.85.)

Under the Compact, tribes must contribute to the Fund a specified percentage of their average "net win," which is a portion of gambling revenue derived from slot machines. (*Cates I, supra*, 154 Cal.App.4th at p. 1305.) The Compact stated: " 'Net Win' means 'net win' as defined by American Institute of Certified Public Accountants." (Former Compact, § 2.15.) The AICPA (American Institute of Certified Public Accountants) defines "net win" as the difference between gaming wins and losses before deducting costs and expenses.

The tribes' first quarterly reports and payments were due on October 30, 2002. Before that time, the Commission hired Dr. John Mills, an independent certified public accountant and accounting professor, to render an expert opinion on the "net win" definition used by the AICPA. Based on his opinion, on September 4, 2002, "the Commission adopted the 'net win' definition set forth in the AICPA Audit and Accounting Guide . . . which uses the term synonymously with 'win' and 'gross gaming revenue.' "

Thereafter many Indian tribes raised concerns about the application of the AICPA " 'net win' " definition. To resolve these concerns, in January 2003, the Commission again hired Dr. Mills to render an additional expert opinion regarding the " 'costs and expenses' that could appropriately be deducted under the AICPA's 'net win' definition." Dr. Mills did not complete this task for more than one year.

The same month that the Commission hired Dr. Mills for the second time, in January 2003, former Governor Gray Davis issued Governor's Executive Order No. D-66-03 (Jan. 29, 2003) (2003 Executive Order) acknowledging that the tribes are required to make quarterly contributions to the Fund under the "net win" formula set forth in the Compact and submit certified quarterly reports to the state for such contributions. The order stated the Commission is the authorized state body that "shall" (1) collect and account for all contributions to the Fund and (2) collect and analyze the certified quarterly reports submitted by the tribes.

## B. *The Lawsuit*

In 2003, Cates was a law enforcement agent with California's Division of Gambling Control (Gambling Control Division), a separate agency from the Commission. The Gambling Control Division is a law enforcement unit within California's Department of Justice responsible for investigating violations of controlled gambling laws and enforcing those laws. (See Gov. Code, § 15001; Bus. & Prof. Code, § 19826; *Cates I, supra,* 154 Cal.App.4th at p. 1306.)

At some point in late 2002 or early 2003, Cates began complaining to Gambling Control Division management that the Indian tribes were refusing to comply with her requests to produce documents, including copies of audit-related documents. When she did not receive a satisfactory response, Cates retained attorneys who conducted an extensive independent investigation.

Based on this investigation, on November 26, 2003, Cates filed a taxpayer's action seeking injunctive and declaratory relief, alleging that the tribes were not paying their required share of "net win" revenue into the Fund. Defendants included the Commission, the Controller, and the Attorney General. Cates alleged that since 1999 the Indian tribes have received in excess of $3 billion per year in gambling revenues, but the state entities were not fulfilling their statutory duties to collect or require the tribes to account for the portion of funds owed to the state. Cates further alleged that defendants had failed and refused to properly collect and analyze the tribes' required quarterly reports.

One month before filing the lawsuit, Cates wrote a letter to the Controller requesting that the Controller discharge its mandatory duties to collect required amounts of gaming revenue from the Indian tribes. On the same date she filed the lawsuit, Cates wrote a letter to the Commission, similarly expressing concern that the Commission was not properly collecting funds owed from the tribes. Neither agency responded to the letters.

When Cates filed her complaint, only one audit of a small Indian tribe had been completed, and this audit was primarily for training purposes. At the time, there were approximately 28 Indian tribes required to pay a portion of their "net win" income into the Fund.

## C. *Summary of Litigation and Related Events*

In 2004, the Controller and Attorney General filed a demurrer arguing they had no duty to collect or oversee money due to the Fund. The demurrer was overruled. Several months later, these same parties moved for summary

judgment on the grounds that Cates lacked standing to maintain the action, they had no responsibility to collect or account for contributions to the Fund, and the tribes were indispensible parties to the action. (*Cates I, supra*, 154 Cal.App.4th at p. 1306.) The trial court rejected these arguments and denied the motion. (*Ibid.*)

In September 2004, two Commissioners provided deposition testimony in which they acknowledged that compliance audits were essential for determining whether the tribes were paying the correct amount of their net win earnings under the Compact, but that audits were not being conducted and the Commission did not know whether the tribes were paying their required quarterly contributions because the tribes were using various definitions of "net win" and the Commission had not yet defined the phrase. (*Cates I, supra*, 154 Cal.App.4th at pp. 1310–1311.)

In February 2005, the Commission published written guidelines pertaining to the "net win" definition based on Dr. Mills's second report. The guidelines provided a definition that was essentially the same definition that Dr. Mills had provided in 2002.

Defendants thereafter moved for summary judgment, arguing Cates was not entitled to injunctive or declaratory relief because (1) none of the tribes were delinquent in their payments to the Fund; (2) the Commission fulfilled its statutory duties; and (3) the Controller had no collection obligation because the tribes were not delinquent in their payments to the Fund. (*Cates I, supra*, 154 Cal.App.4th at p. 1306.) In addition to presenting the Compact and the 2003 Executive Order, defendants based their motion on a declaration of Gary Qualset, the deputy director of the Commission's compliance division. (154 Cal.App.4th at pp. 1308–1309.) In his declaration, Qualset claimed that since April 2003, the Commission had *commenced* audits of nine of the 28 tribes, but had completed only *one* of those audits. (*Id.* at p. 1309.) He also claimed that audits were discretionary, and that " 'desk reviews' " were sufficient to show there were no delinquencies. (*Ibid.*) In opposition, Cates presented the September 2004 deposition testimony of the two Commissioners who stated that audits were not being conducted pending a clarification of the "net win" standard. (*Id.* at pp. 1310–1311.)

The trial court granted defendants' motion, finding that based on Qualset's declaration and the court's examination of the Compact and the 2003 Executive Order, the record showed defendants had complied with their statutory duties as a matter of law and there was no reason to initiate any collection actions because no tribe had been found delinquent. (*Cates I, supra*, 154 Cal.App.4th at p. 1309.)

In a published opinion, we reversed the summary judgment. (*Cates I, supra*, 154 Cal.App.4th at pp. 1304–1305.) We held the court erred in concluding defendants met their burden to show they were entitled to judgment as a matter of law, and alternatively we determined there were triable issues of fact. (*Id.* at pp. 1308–1311.) We found the trial court's factual premise underlying its conclusion—that there were no delinquencies by the tribes—to be faulty. (*Id.* at p. 1310.) We explained defendants had failed to proffer any evidence showing they had conducted a proper audit or other evaluation of the tribes' submissions to permit a fair determination as to whether any amounts were owed. (*Id.* at pp. 1309–1310.) In this regard, we noted that the undisputed evidence showed that only one audit had been completed between 2003 and 2006 and thus "the Commission does not know whether the tribes have paid the appropriate sums into the Fund." (*Id.* at p. 1310.)

We also expressed substantial concern with the deposition testimony of the two Commissioners who said the " 'net win' " phrase remains ambiguous and the tribes were using their own definitions of the standard to calculate the owed amounts. (*Cates I, supra*, 154 Cal.App.4th at p. 1311.) Despite acknowledging that audits were necessary to determine whether the tribes were using the correct definition and paying the correct amounts and that audits were not being conducted because of the "net win" controversy, these Commissioners said they believed the tribes were paying their fair share into the Fund "because no tribe was behind in its payments into the Fund or its payment of any penalty." (*Ibid.*)

We found the Commissioners' deposition testimony to be "startling because the Compact unambiguously defines the term 'net win.' " (*Cates I, supra*, 154 Cal.App.4th at p. 1311.) We further stated: "The testimony is even more troubling given Qualset's assertion that the Commission accounts for all Fund contributions by performing 'desk reviews' of all quarterly Fund contribution reports submitted by the tribes to ensure the mathematical accuracy of the reports . . . . We are at a loss to understand exactly how the Commission can possibly 'ensure the mathematical accuracy of the reports' when 'net win' is a critical element in calculating the contribution amount, but the Commission purportedly does not know how 'net win' is defined. It appears from the evidence presented that the Commission is simply verifying the accuracy of mathematical calculations set forth in the reports submitted by the tribes without confirming that the numbers used to perform the calculations are those called for by the Compact. Needless to say, the Commission cannot collect and account for Fund contributions and collect and analyze the reports submitted by the tribes without knowing the definition of 'net win.' " (*Ibid.*)

Cates filed her appeal in *Cates I* in May 2006, and the *Cates I* decision was issued in September 2007. Although no Commission audits had been completed in 2004 or 2005, the Commission completed eight audits by the end of 2006, 14 in 2007 and six in 2008. By late 2008, the Commission completed audits of all 27 or 28 tribes that were required to contribute a portion of their "net win" revenue to the Fund.

In May 2009, the parties entered into a stipulation to dismiss Cates's causes of action for injunctive and declaratory relief. The stipulation stated: "[P]laintiff is now satisfied that the Commission is complying with its mandatory duties . . . and that appropriate accounting, auditing and collection procedures are in place to account for and collect monies due the State from tribal . . . gaming." The stipulation further provided "the issue of entitlement to attorney fees and costs will be determined through bifurcated proceedings in which the issue of plaintiff's entitlement to attorney fees will be determined first, followed by a determination of the amount of any award, if necessary."

### D. *Entitlement Phase*

In the entitlement phase, Cates sought to recover her attorney fees under a section 1021.5 catalyst theory, asserting that she filed the lawsuit in 2003 to "force California state officials to do what they had been unwilling to do; analyze, confirm and account for payments due the [state] from Indian gaming tribes" and that "[b]ecause of her lawsuit, certain state officials/state entities changed their behavior regarding oversight duties in connection with Indian gaming activities in California, resulting in the determination that the tribes had under-reported their net winnings by over $100,000,000 . . . resulting in an underpayment to the State of over $12,880,737 . . . , $11,539,869 of which has finally been collected." (Boldface omitted.)

In support, Cates relied on the *Cates I* decision showing that although the Commission had had a legal mandate since 2002 to ensure the tribes were properly reporting and paying the required money into the Fund, two years later the Commissioners acknowledged in their testimony that the Commission was not yet implementing these duties. (*Cates I, supra*, 154 Cal.App.4th at pp. 1308–1311.) Cates also relied on the evidence showing that only one audit was completed before 2006 and that the "desk reviews" performed by the Commission during this time were not reasonably calculated to obtain sufficient information to determine whether the tribes were complying with their mandatory duties.

To show the results of her lawsuit, Cates relied on a January 2008 letter written by the Commission chair stating: "To date, we have completed 29

financial audits on tribes that contribute to the [Fund] and seven audits on tribes that contribute to the general fund. From these audits we have identified underpayments to the state totaling approximately $12.7 million and are collecting this money." Cates also presented a chart showing that since September 2002 the tribes had underpaid approximately $12.8 million (including interest) in amounts owed from gambling revenue and the Commission has collected approximately $11.5 million of this amount.

Cates additionally proffered evidence to show the Commission's asserted justifications for its prior failure to monitor and enforce the "net win" obligations were pretextual and unreasonable. In this regard, Cates submitted a declaration of Craig Greene, a certified public accountant, who has extensive experience in Indian gaming accounting and auditing issues. Greene explained that the Compact's definition of "net win" ("the difference between gaming wins and losses before deducting costs and expenses") was "clear and unambiguous" and is "the generally accepted definition" used by federal regulators, other states involved in the gaming industry, and textbooks dealing with the Indian gaming subject. (Underscoring omitted.) Greene opined that the Commission's failure to perform necessary audits before 2006 was unreasonable, explaining that compliance audit procedures for determining " 'net win' " earnings are "well known" in the industry and generally take "between two to four weeks."

Cates also submitted reports from California's Legislative Analyst's Office pertaining to the 2005–2006 and 2006–2007 state budgets, recommending that the Legislature deny the Commission's requests to retain more auditors because of the "limited financial audit productivity" from existing staff.

Cates also presented her counsel's letters sent to the Controller one month before she filed the lawsuit and to the Commission on the day she filed the lawsuit, notifying these agencies of Cates's concerns that these agencies were not complying with their duties to ensure the tribes were paying the required amounts.

Opposing Cates's motion, defendants argued that Cates did not prove she was a successful party under the catalyst theory because her lawsuit "did not result in any changed behavior by State Defendants" as the Commission had already sought expert definitions of "net win" and the efforts to audit the tribes were "ongoing" when she filed her lawsuit. In support, defendants relied primarily on the declaration of former Commission compliance manager Qualset. Qualset denied that Cates's lawsuit had any effect on the Commission's compliance with the Compact, stating: "None of the goals, plans or any policy, procedure or action taken in the area of Commission compliance with its . . . review, audit, and collection functions . . . were put

into practice, accelerated or changed as a result of Plaintiff's lawsuit." He asserted that the Commission's delays were instead caused by "Budget constraints, multiple workload responsibilities, staff experience, and recurring concerns about the definition of 'net win' raised by many [Fund]-paying tribes . . . ." Qualset also detailed the Commission's efforts to define the "net win" standard and its "outreach efforts" with the various Indian tribes. Qualset claimed that three audits were scheduled in 2003, but acknowledged that two of those audits were not completed for more than two years. The Commission also submitted the declaration of its current compliance manager, Rachelle Ryan, who stated: "Between April 2003 and October 2008, the Commission completed audits of every [Fund] tribe—and in some cases had twice audited tribes. . . ." She also stated that the Commission's methods and practices for determining compliance have "evolved" and become more accurate over time.

Defendants also argued that Cates was barred from recovering under the catalyst theory because she had not provided the agencies with adequate notice before filing the lawsuit. They argued that the two letters relied upon by Cates were insufficient to provide defendants with a reasonable opportunity to settle the matter.

After considering the parties' submissions and holding a hearing, the court concluded that Cates satisfied her burden under section 1021.5 to show she is entitled to attorney fees as the successful party against the Commission and the Controller.[2] On the issue of causation, the court found the evidence supported a "strong" inference that Cates's action was a catalyst of these agencies' actions, and defendants did not present credible evidence to rebut this conclusion. On the issue of prelitigation notice, the court found that although Cates's letters may have been insufficient to constitute a reasonable settlement effort, the insufficiency was excused because any earlier or more specific notice would have been futile.

### E. *Attorney Fees Amount Phase*

In the second phase, the court (Judge Dato) awarded Cates $2,011,844, which reflected a lodestar of $1,087,483 (2,398 attorney hours at a $451 blended hourly rate; plus 45 paralegal hours at a $133 hourly rate) and a 1.85 positive multiplier. The facts relevant to the court's conclusion will be set forth in the Discussion portion below.

The Commission and the Controller appeal from both orders.

---

[2] The court found Cates did not prove the catalyst theory as to the Attorney General. Because no fees were awarded against the Attorney General, we omit further discussion of the Attorney General as a party in Cates's lawsuit.

## DISCUSSION

### I.  *Entitlement to Attorney Fees Based on Catalyst Theory*

#### A.  *Generally Applicable Legal Principles*

Under section 1021.5, " 'the court may award attorney fees to a "successful party" in any action that "has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." . . .' " (*Graham, supra,* 34 Cal.4th at p. 565.)

■  California courts have long held an attorney fees award under section 1021.5 may be justified "even when plaintiff's legal action does not result in a favorable final judgment" if there is "a causal connection between the plaintiffs' lawsuit and the relief obtained." (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1290–1291 [240 Cal.Rptr. 872, 743 P.2d 932] (*Maria P.*); accord, *Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 352–353 [188 Cal.Rptr. 873, 657 P.2d 365].) In *Graham,* the California Supreme Court reaffirmed that the catalyst theory is "sound" and supported by the plain language of section 1021.5. (*Graham, supra,* 34 Cal.4th at pp. 568, 571–572.) The court explained: "The term 'successful party,' [in section 1021.5] as ordinarily understood, means the party to litigation that achieves its objectives . . . [and] 'where the ultimate goal is . . . a favorable alteration of actual circumstances, a formal declaration is not essential. . . . [¶] A lawsuit's ultimate purpose is to achieve actual relief from an opponent. . . . On this common understanding, if a party reaches the "sought-after destination," then the party "prevails" regardless of the "route taken." ' " (*Id.* at p. 571.) The court also emphasized the strong policy reasons favoring the continued application of the catalyst theory, which include encouraging public interest litigation and ensuring that attorneys who successfully bring lawsuits protecting the public interest are properly compensated. (*Id.* at p. 574.) The court noted that "[a]bolition of the catalyst theory [would] increase an already considerable risk" that these attorneys will not be paid for their work. (*Ibid.*)

■  The *Graham* court recognized, however, the potential for abuse because allowing recovery under the catalyst theory could "encourage nuisance suits by unscrupulous attorneys hoping to obtain fees without having the merits of their suit adjudicated." (*Graham, supra,* 34 Cal.4th at p. 574.) To discourage extortionate lawsuits "without putting a damper on lawsuits

that genuinely provide a public benefit," the court adopted two "sensible limitations on the catalyst theory." (*Id.* at p. 575.) First, the trial court must determine the lawsuit is "not 'frivolous, unreasonable, or groundless' . . . ." (*Ibid.*) Second, (as will be discussed in more detail below) "a plaintiff seeking attorney fees under a catalyst theory must first reasonably attempt to settle the matter short of litigation." (*Id.* at p. 577.)

"Whether the applicant for attorney fees has proved section 1021.5's elements is a matter primarily vested in the trial court." (*Wal-Mart Real Estate Business Trust v. City Council of City of San Marcos* (2005) 132 Cal.App.4th 614, 620 [33 Cal.Rptr.3d 817].) "The trial judge is considered to be in the best position to determine whether the criteria have been met, and its determinations will not be disturbed ' "unless the appellate court is convinced that it is clearly wrong." ' " (*County of Orange v. Barratt American, Inc.* (2007) 150 Cal.App.4th 420, 441 [58 Cal.Rptr.3d 542], quoting *Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303].) To demonstrate a prejudicial abuse of discretion, " ' " 'it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice . . . .' " ' " (*Maria P., supra,* 43 Cal.3d at p. 1291.)

Defendants contend the court erred in finding Cates was entitled to attorney fees under section 1021.5's catalyst theory because the evidence was insufficient to show (1) her lawsuit *caused* a substantial public benefit and achieved the primary relief sought, and (2) she made a reasonable attempt to settle the lawsuit before filing her action. We address these contentions below.

### B. Court's Finding That Cates Satisfied Causation Element of Catalyst Theory

Defendants first contend the court erred in finding Cates was a successful party under section 1021.5 because the evidence does not support that her lawsuit *caused* or *motivated* the public agencies to change their behavior and provide the primary relief sought. As explained below, we reject this argument as to the Commission, but find it has merit with respect to the Controller.

### 1. Governing Legal Principles

To satisfy the causation prong of the catalyst theory, the plaintiff need not show the "litigation [was] *the only cause* of defendant's acquiescence. Rather, [the] litigation need only be a substantial factor contributing to defendant's action." (*Hogar Dulce Hogar v. Community Development Com. of City of Escondido* (2007) 157 Cal.App.4th 1358, 1365 [69 Cal.Rptr.3d 250];

see *Californians for Responsible Toxics Management v. Kizer* (1989) 211 Cal.App.3d 961, 967 [259 Cal.Rptr. 599].) "Put another way, courts check to see whether the lawsuit initiated by the plaintiff was 'demonstrably influential' in overturning, remedying, or prompting a change in the state of affairs challenged by the lawsuit. [Citations.]" (*Karuk Tribe of Northern California v. California Regional Water Quality Control Bd., North Coast Region* (2010) 183 Cal.App.4th 330, 363 [108 Cal.Rptr.3d 40].)

In conducting the causation analysis, " ' "[t]he appropriate benchmarks . . . are (a) the situation immediately prior to the commencement of suit, and (b) the situation today, and the role, if any, played by the litigation in effecting any changes between the two." ' " (*Maria P., supra*, 43 Cal.3d at p. 1291.) Further, deciding the causation prong of the catalyst theory does not demand "complex and time-consuming litigation over the issue of causality." (*Graham, supra*, 34 Cal.4th at p. 573.) The causation issue "may be resolved by relatively economical, straightforward inquiries by trial judges close to and familiar with the litigation." (*Ibid.*) "The trial court's determination of causation is entitled to deference by the appellate court if there is any reasonable basis in the record to support the determination." (*California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730, 743 [246 Cal.Rptr. 285].) We are required to draw all reasonable inferences in support of the findings and view the record most favorably to the court's conclusion. If there is evidence to support the court's finding, we must affirm even if other evidence supports a contrary finding or a different fact finder could have reasonably reached a different conclusion. (See *Godinez v. Schwarzenegger* (2005) 132 Cal.App.4th 73, 92 [33 Cal.Rptr.3d 270]; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393 [32 Cal.Rptr.3d 526]; see also *Graham, supra*, 34 Cal.4th at p. 577.)

### 2. *Causation as to Cates's Claims Against Commission*

The chronology of events supports the court's finding that Cates met her burden to show her lawsuit motivated the Commission to provide the primary relief sought by Cates—the proper enforcement of the tribes' obligations to pay a specified portion of their gambling revenues into the Fund.

By early 2003, Cates, who worked as a law enforcement agent in the investigations unit of the Gambling Control Division, was aware that the tribes were failing to provide audit-related documentation and became concerned about the tribes' compliance with their Compact obligations. Based on her knowledge of the gambling industry and after independent investigation by her counsel, in November 2003, Cates filed her taxpayer's lawsuit, arguing the Commission was not fulfilling its statutory duty to ensure the tribes were paying the required amounts under the Compact. Cates requested the court to

order "defendants to discharge their statutory and contractual duties, and collect monies belonging to the State from various Indian tribes who are generating revenue from Indian gaming operations in the State of California."

During discovery, it became apparent that the Commission had not been conducting appropriate audits necessary to comply with its legal obligation to monitor the tribes' payment obligations and collect delinquencies. In 2007, this court filed a strongly worded opinion questioning whether the Commission was complying with its statutory obligations and finding "startling" and "troubling" the Commissioners' testimony that there were no delinquencies, despite the Commissioners' admissions that they did not know whether the tribes were paying the correct amounts because they were still grappling with the definition of the "net win" phrase, a standard which this court (and Cates's expert) found was "unambiguous[]." (*Cates I, supra,* 154 Cal.App.4th at p. 1311.)

One year after we filed this appellate opinion, the Commission completed audits on each of the approximately 28 tribes required to pay into the Fund and found the tribes had underreported the "net win" by over $100 million. As of September 30, 2009, the tribes' net underpayments and accrued interest totaled about $12.8 million, of which the Commission had already collected about $11.5 million.

Based on the timing of the events, and the fact that for several years the Commission had engaged in a perplexing focus on the definition of "net win" (a commonly used calculation standard in the industry) to argue that it was unable to perform appropriate audits of the Indian tribes, Judge Oberholtzer found a "strong inference" that the Commission would not have moved forward with its obligations without the lawsuit prompting it to do so. The court stated "it's not a very close call" and that although the evidence is "circumstantial and one needs to draw the inference, . . . that inference . . . is for the most part unrebutted or is rebutted by testimony that just isn't very convincing." Viewing the entire record, the court had a substantial evidentiary basis to reach this conclusion.

The Commission does not dispute that its recovery of the delinquencies was the result of its conducting audits and requiring the tribes to apply a proper definition of "net win" in calculating the amounts owed to the state. However, it argues that these actions were the result of its independent actions, and not motivated at all by the lawsuit.

In support, the Commission relies primarily on Qualset's declaration in which he stated that Cates's lawsuit had nothing to do with the Commission's changes in its policies and its substantial monetary recovery. However, the

court had a reasonable basis to reject Qualset's assertions. The Commission provided no documentation to support Qualset's asserted reasons for the failure to earlier perform the Commission's monitoring/collection functions (e.g., insufficient staff, lack of training). Additionally, Qualset's proffered reasons were refuted by the Commissioners' earlier testimony that the "net win" controversy was the primary basis for the Commission's failure to move forward with the audits, a controversy that appeared to be lacking in foundation.

Moreover, contrary to the Commission's assertions, the litigation did not just cause an acceleration of audits that were already underway. The record supports a conclusion that Cates's lawsuit essentially altered the Commission's procedures and methods for determining whether the Indian tribes had paid the proper amounts and for collecting delinquent payments. Cates presented evidence that before she filed the lawsuit, various tribes were refusing to provide necessary financial documents and the Commission was merely confirming the mathematical accuracy of tribe-provided information without defining the crucial "net win" standards under which monitoring and compliance could be properly performed. Cates's evidence also showed that by the time the lawsuit was dismissed, the Commission was conducting indepth audits designed to determine whether the tribes were complying with the financial obligations required under the Compact. Because only one audit was completed before 2006 (four years after the tribes were required to submit quarterly reports and payments) and it was not until early 2005 that the Commission settled on a definition of "net win," the court could reasonably conclude that a proper audit process had not been established before, or independent of, the lawsuit, and instead the appropriate monitoring and enforcement came about because Cates continued to hold the Commission's feet to the fire to perform its mandatory duties. In short, there was substantial evidence to support the court's finding "Cates was a catalyst to the reforms that were made by the [C]ommission."

In its opening brief, the Commission sets forth the chronology of litigation and the Commission's enforcement efforts in an attempt to show that Cates's lawsuit had nothing to do with its actions between 2003 and 2009. However, this discussion violates well-established appellate rules because it portrays the facts in the light most favorable to the Commission and makes factual inferences in the Commission's favor. (See *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398–399 [185 Cal.Rptr. 654, 650 P.2d 1171].) For example, the Commission argues that the fact that it twice retained Dr. Mills to provide assistance with the "net win" definition "refute[s]" Cates's claim that before she filed the lawsuit the Commission " 'simply permitted the tribes to pay what they chose to pay upon their own individual definitions of "net win." ' " Although a trial court could possibly make this inference, it was not the only or even the most reasonable deduction from the evidence. Viewing the

totality of the circumstances, it was equally likely that the Commission twice retained Dr. Mills because the politically influential Indian tribes were challenging the Commission's authority to appropriately monitor the "net win" payments, and, for reasons that are not clear in the record, the Commission was using the "net win" controversy to justify its inaction and its unwillingness to require the tribes to comply with the Compact.

The Commission also argues that the court erred in finding Cates was entitled to attorney fees under the catalyst theory because she did not obtain the "primary relief sought" by the litigation. (See *Tipton-Whittingham v. City of Los Angeles* (2004) 34 Cal.4th 604, 608 [21 Cal.Rptr.3d 371, 101 P.3d 174] [lawsuit must be "a catalyst motivating the defendants to provide the primary relief sought"].) In bringing her lawsuit, Cates sought to compel the Commission to discharge its legally mandated duties to collect funds belonging to the state from the various Indian tribes. This is precisely the relief obtained from the lawsuit. In practical terms, Cates obtained exactly what she was seeking—the Commission's proper monitoring and enforcement of the tribes' obligation to pay a percentage of their "net win" to the Fund.

█ We thus conclude substantial evidence supports the trial court's finding that Cates met her burden to show the causation element as to the Commission. However, as explained below, we reach a different conclusion with respect to the Controller.

### 3. *Causation as to Cates's Claims Against Controller*

The Controller argues there is no evidence in the record showing that Cates's lawsuit caused the Controller to do anything differently or that Cates obtained her primary litigation goal against the Controller. On our review of the record, we agree with these arguments. We thus conclude that Cates cannot recover attorney fees under the catalyst theory against the Controller.

█ In her complaint Cates alleged the Controller violated its mandatory duty to collect the tribes' delinquencies pursuant to Government Code section 12418. Under this code section, the Controller is responsible for collecting debts owed to the state and is authorized to institute suits to collect this money. (*People v. Willie* (2005) 133 Cal.App.4th 43, 52, fn. 9 [34 Cal.Rptr.3d 532]; *Brunius v. Parrish* (2005) 132 Cal.App.4th 838, 846–847 [34 Cal.Rptr.3d 55]; *Vasquez v. State of California* (2003) 105 Cal.App.4th 849, 855 [129 Cal.Rptr.2d 701].)

Cates does not point to, nor have we found, any evidence in the record showing that after Cates filed her lawsuit, the Controller participated in the collection of the delinquencies or changed any of its procedures regarding its

collection of funds owed to the state. Instead, it appears the Controller relies on the Commission to monitor and identify delinquencies with respect to the tribes' "net win" payments. Cates presented no evidence that her lawsuit caused the Controller to do anything different from what it had been doing before the lawsuit was filed.

Relying on our reversal of the summary judgment in the *Cates I* decision, Cates argues that "this appellate victory as to the Controller is itself sufficient to justify the fees award." In holding that the trial court erred in granting summary judgment in favor of the Controller and Attorney General, we stated: "We do not agree that the Controller and the Attorney General have no duties unless a delinquency exists. Be that as it may, Defendants have not proven that there is not a delinquency; accordingly, judgment in favor of these entities was inappropriate." (*Cates I, supra*, 154 Cal.App.4th at p. 1310.)

■ Although a published opinion clarifying the law may vindicate an important public interest and support an award of fees under section 1021.5 (see *Leiserson v. City of San Diego* (1988) 202 Cal.App.3d 725, 737 [249 Cal.Rptr. 28]), there must be a showing that the clarification of the law was the primary relief sought by the plaintiff and/or that the appellate decision motivated the defendant to provide the primary relief requested in the lawsuit. (See *Marine Forests Society v. California Coastal Com.* (2008) 160 Cal.App.4th 867, 878–879 [74 Cal.Rptr.3d 32].)

In this case, there is no showing the holding or reasoning in *Cates I* clarified unsettled law with respect to the Controller's duties or that the primary relief sought by Cates's lawsuit was to clarify the law regarding the Controller's statutory obligations. Cates argues that we must presume the Controller is performing his official duty in accordance with the *Cates I* decision. (See Evid. Code, § 664.) While this may be true, Cates does not explain the connection between her lawsuit and the Controller's performance of his official duties. Cates presented no evidence that the Controller ceased acting in a particular way or voluntarily instituted new procedures as a result of the lawsuit or this court's appellate decision.

On this record, the court erred in concluding that Cates met her burden to show the causation element of the catalyst theory as to the Controller.

### C.   *Requirement Plaintiff Engage in Reasonable Prelitigation Settlement Efforts*

The Commission also challenges Cates's entitlement to the attorney fees award under a catalyst theory based on her failure to show she attempted to settle the matter before she filed her lawsuit.

## 1. *Legal Principles*

■ In *Graham*, the California Supreme Court held "a plaintiff seeking attorney fees under a catalyst theory must first reasonably attempt to settle the matter short of litigation" (the "prelitigation notice" requirement). (*Graham, supra*, 34 Cal.4th at p. 575.) The high court stated this requirement serves to assure that the plaintiff has satisfied section 1021.5's statutory requirement that the plaintiff must show the " 'necessity . . . of private enforcement' " of the public interest. (*Graham, supra*, 34 Cal.4th at p. 577.) The court explained: "Awarding attorney fees for litigation when those rights could have been vindicated by reasonable efforts short of litigation does not advance that objective and encourages lawsuits that are more opportunistic than authentically for the public good. Lengthy prelitigation negotiations are not required, nor is it necessary that the settlement demand be made by counsel, but a plaintiff must at least notify the defendant of its grievances and proposed remedies and give the defendant the opportunity to meet its demands within a reasonable time." (*Ibid.*)

## 2. *Relevant Facts and Procedure*

In support of her argument in the trial court that she attempted to settle the matter before filing suit, Cates produced two letters from her counsel asserting that defendants were not providing the required oversight of the tribes' payment obligation. The first letter was sent *to the Controller* one month before the lawsuit was filed, and consisted of one sentence asking the Controller to discharge its mandatory duty and collect funds owed to the state from the Indian tribes earned from gaming revenue. The second letter was sent to the Commission on the same date the complaint was filed. This letter similarly stated: "On behalf of our client, Candace Cates, a California taxpayer, we request you discharge your duties under state law and pursuant to the Indian Gaming Compacts, and collect all money that is due and owing to the State of California from Tribal gaming." Neither the Commission nor the Controller responded to the letters.

Defendants countered that given the timing and lack of specificity in the letters, they did not constitute "sincere efforts to notify State Defendants of the existence of a grievance, propose remedies and give State Defendants the opportunity to meet Plaintiff's demands within a reasonable time prior to filing suit."

In reply, Cates argued that even if the notices were insufficient, any additional or earlier notice would have been futile.

Judge Oberholtzer found Cates's letters to be insufficient (untimely and lacking specificity) to constitute a reasonable settlement effort within the

meaning of the *Graham* prelitigation notice rule. But the court concluded the insufficiency was excused because any earlier or more detailed notice would have been futile. Noting that defendants continued to insist for several years after Cates filed the lawsuit that they were doing nothing wrong and that they were fully complying with their duties, the court found defendants would not have agreed to change their procedures even if Cates had timely notified the Commission about its failure to comply with its duties. The court stated: "[T]he point is that [Cates] could have complained till the cows came home, but there wasn't going to be any positive response from the [C]ommission because the [C]ommission obviously did its investigation and it hired the best attorneys . . . and they went through this stuff and said, 'Nah, Nothing here.' "

The court further noted there was no indication whatsoever that Cates was "trying to sandbag the agency by giving some trivial notice and then lying in the weeds. Frankly, I have experience in that because the very issue arises all the time in employment litigation. You just have to look at it and use your common sense to make a determination. Does it sound like this person was attempting to mislead solely for the purposes of getting that check in the box and then filing the lawsuit, hoping that the agency wouldn't do anything? If we had that situation, I agree, we should find that there was no reasonable notice. I can't find from the evidence that we do have that situation."

### 3. *Analysis*

In its opening appellate brief, the Commission contends the court erred in relying on Cates's counsel's letters to find that Cates reasonably attempted to settle the litigation before she filed her lawsuit. The Commission notes that Cates sent the letter to the Commission on the same date the lawsuit was filed (and there is no evidence as to the date the letter was received); this letter did not provide any information as to the specific conduct alleged to be wrongful; and there was no showing the earlier letter sent to the Controller provided any notice to the Commission, which is a separate and independent agency.

However, as described above, Judge Oberholtzer did not find the letters were sufficient to satisfy Cates's burden. Instead, the court found the prelitigation notice requirement was excused because any settlement attempts would have been futile. In its reply brief, the Commission argues that the court erred by applying the futility exception. This argument is waived. By failing to adequately raise this issue in its opening brief, the Commission deprived Cates of the opportunity to respond to its legal arguments. (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78

Cal.App.4th 847, 894, fn. 10 [93 Cal.Rptr.2d 364].) " ' "Obvious consider-ations of fairness . . . demand that the appellant present all of his points in the opening brief. . . ." ' " (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [60 Cal.Rptr.2d 770].)

In any event, we conclude the Commission's argument fails on its merits.

First, to the extent the Commission challenges the sufficiency of the evidence to support the court's futility finding, the court's conclusions are supported by the evidence. As the trial court found, after Cates filed her lawsuit, the Commission denied that it had any responsibility to do anything different with respect to the Indian tribes' gambling income. From 2003 through 2007, the Commission continued to engage in actions showing that it believed it had fulfilled all of its statutory duties, including affirmatively asserting that none of the tribes was delinquent in its payments to the Fund. Further, Cates's employer, which had the duty to enforce gambling laws, had apparently taken no action in response to Cates's workplace complaints. Based on this history, the court had a reasonable basis to conclude that an earlier or more detailed prelitigation notice by Cates "would have been futile" and "a waste of time."

The Commission alternatively argues that the court erred because there is no futility exception to *Graham*'s prelitigation notice requirement.

In establishing the prelitigation notice rule in section 1021.5 catalyst cases, the *Graham* court stated the purpose of adopting this "sensible" rule was to discourage "lawsuits that are more opportunistic than authentically for the public good." (*Graham, supra*, 34 Cal.4th at p. 577.) The court was also responding to the defendant's complaints that "the catalyst rule could encour-age nuisance suits by unscrupulous attorneys hoping to obtain fees without having the merits of their suit adjudicated." (*Id.* at p. 574.) The court additionally discussed that the rule was closely related to section 1021.5's express statutory requirement that a plaintiff must show the " 'necessity . . . of private enforcement' . . . ." (34 Cal.4th at p. 577.) If a defendant would be willing to provide the requested relief in a prelitigation settlement, the plaintiff's lawsuit was not necessary. (*Ibid.*)

█  Four years later, the California Supreme Court refused to extend the prelitigation notice requirement to noncatalyst attorney fee cases, emphasiz-ing that the rule was *not* compelled by section 1021.5. (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 251–259 [85 Cal.Rptr.3d 466, 195 P.3d 1049] (*Vasquez*).) In *Vasquez*, the high court explained that it had "adopted" the prelitigation notice rule in *Graham* primarily *"to guide the [trial court's]* exercise of judicial discretion . . . ." when the plaintiff seeking fees under

section 1021.5 had not achieved a final judgment. (*Vasquez, supra,* at pp. 247, 254–255, italics added.) Although the *Vasquez* court referred to this requirement in catalyst cases as a "bright-line" and "categorical" rule, the court left open the question of whether a futility exception could be properly applied to such a rule. (*Id.* at pp. 247, 259 & fn. 5.)

■ Reading *Vasquez* and *Graham* together, the prelitigation notice requirement is an important categorical rule in section 1021.5 catalyst cases and cannot be ignored merely because the court believes it would be equitable for the plaintiff to receive a fee award or that the plaintiff had a good excuse for failing to engage in these efforts. But because it is a judicially created rule to promote the purposes of section 1021.5 and deter attorneys from filing meritless suits merely to obtain attorney fees, it should not be applied to bar an attorney fees recovery where to do so would defeat the core purpose of the statute.

The essence of Cates's action was to successfully expose a state agency's ongoing refusal to comply with its mandatory duties to monitor and collect payments owed to the state. The evidence showed that for several years after Cates filed the action, the Commission continued to strongly assert that its practices were appropriate and the tribes did not owe the state any money. There is no evidence that the Commission would have agreed to change its procedures in response to a prelitigation settlement offer or that negotiating with the Commission was a reasonable alternative to the lawsuit. Moreover, the trial court made a specific finding, unchallenged in the proceedings below and on appeal, that Cates did not bring the lawsuit for an improper motivation, such as to obtain attorney fees. Additionally, before filing its answer, the Commission had the full opportunity to negotiate an end to the lawsuit by providing the relief sought. However, the Commission made clear that it was not willing to modify its challenged conduct.

■ Under these particular circumstances, it would be contrary to the language of section 1021.5 and the underlying legislative intent to bar Cates from recovery based solely on her failure to provide a timely prelitigation demand letter. As the California Supreme Court has stated in another context: "Generally a demand is not a prerequisite where it would be futile or an idle gesture." (*Steen v. Board of Civil Service Commissioners* (1945) 26 Cal.2d 716, 721 [160 P.2d 816].) "The law does not require useless acts from litigants as prerequisites to seeking relief from the courts." (*Van Gammeren v. City of Fresno* (1942) 51 Cal.App.2d 235, 240 [124 P.2d 621]; see *Doster v. County of San Diego* (1988) 203 Cal.App.3d 257, 262 [251 Cal.Rptr. 507] ["The law does not require a party to participate in futile acts."]; Civ. Code, § 3532; see also *People v. Herrera* (2010) 49 Cal.4th 613, 622 [110 Cal.Rptr.3d 729, 232 P.3d 710] [law does not require the doing of futile act].)

Viewing *Graham*'s strong reaffirmance of the catalyst theory as necessary to effectuate the important public policies underlying section 1021.5 and *Vasquez*'s characterization of the prelitigation notice rule as a factor "to guide" the court's "exercise of judicial discretion" in catalyst cases (*Vasquez, supra*, 45 Cal.4th at pp. 254–255), the rule should not be applied blindly without any consideration of whether the demand would have made any difference in the need for the lawsuit and whether the plaintiff's motivations were directed toward seeking the relief demanded, as opposed to the recovery of attorney fees. Exercising its broad discretion, the court did not err in concluding that because the undisputed evidence shows a prelitigation demand would have been futile, Cates was not barred from recovering section 1021.5 attorney fees.

## II.   *Challenges to Amount of Fees*

### A.   *Factual Background*

After the matter was reassigned to Judge Dato, Cates filed a motion seeking $3,073,912 in attorney fees, reflecting a lodestar amount of approximately $1.2 million, with a multiplier of 2.5. Cates alternatively requested the court to award approximately $3.2 million in attorney fees under the common fund theory (25 percent of the approximately $12.8 million claimed to have been recovered from the tribes).

In support of the lodestar figure, Cates presented the following information.

When the lawsuit was filed in November 2003, Cates was represented by the Ronquillo & Corrales law firm (owned by Attorneys David Ronquillo and Manuel Corrales, Jr.). Four months later, Attorney Mark Bush began working on the case, and in December 2004, Bush became associate counsel with Ronquillo & Corrales. In 2007, the law firm Legion Counsel (owned by Attorney John Baldwin) substituted for Ronquillo & Corrales, and Legion Counsel was assigned all rights to the case. In representing Cates, Legion Counsel associated with Bush, and later associated with Attorneys Thomas Sharkey and James Chodzko to serve as cocounsel.

Cates submitted Bush's lengthy declaration, which explained that he was involved in representing Cates in the lawsuit from 2003 through the current time and was highly familiar with the case. Bush discussed the nature of the six-year litigation and detailed the numerous services provided by the attorneys. As set forth below, Bush also explained the manner in which attorney time records were prepared and/or reconstructed.

Cates also submitted a lengthy declaration of expert Gerald Knapton, an attorney with substantial experience in reviewing attorney fees requests and

opining on the reasonableness of the requests. Knapton stated he reviewed "[w]ell over 2 billion dollars in nationwide legal fees and work product" and has testified more than 40 times on the reasonableness and necessity of litigation fees and costs.

Knapton concluded that 2,758.25 attorney hours were reasonably incurred in the case. In reaching this conclusion, he reviewed the entire pleading and discovery files and correspondence records in the litigation (about 13 boxes), and conducted multiple interviews with Cates's current attorneys (Baldwin, Bush, Chodzko and Sharkey). "[T]o get a better understanding of the events year by year," Knapton also reviewed Bush's detailed declaration of the attorney work performed since the outset of the case.

Knapton additionally reviewed original and reconstructed time records for the six attorneys who worked on the case. According to Bush's declarations, these time records were prepared as follows: Attorneys Sharkey and Chodzko maintained contemporaneous records of their time. Attorneys Baldwin and Bush "used their files (pleading and discovery), notes, emails, calendars and the like to essentially reconstruct their time." With respect to the time records for Ronquillo and Corrales, there were "challenge[s]" in obtaining this information directly from these attorneys because of various disputes among and between the former and current attorneys and other unrelated issues. However "notwithstanding" these problems, Bush said all case files were "made available" to Ronquillo and Corrales, along with a chronological listing (prepared by a former paralegal of the Ronquillo firm based on the case files) of all services provided by these two attorneys. Thereafter, a detailed list of the services provided by these attorneys and the time incurred with respect to each service was prepared and transmitted to Knapton. It is not clear who prepared this reconstructed list of the Ronquillo and Corrales time records.

Based on all of this information (including Knapton's review of the 13 boxes of files, his discussions with the four current attorneys, and his review of each of the attorney's "original" or "reconstructed" time records), Knapton prepared a 98-page ledger identifying each attorney service (including services by Ronquillo and Corrales) beginning in January 2003 and continuing to February 2011 when the attorney fees motion was filed. Each entry identified the date of the service, the attorney or paralegal who worked on the matter, the number of hours, the hourly rate, a description of the service, and the task to which the service was related. Each of the 98 pages contained about 25 different entries pertaining to each of these categories. In separate charts, Knapton also identified the total time spent by each attorney, the total attorney time spent each year, and the total attorney time spent on each task (e.g., depositions, appeal issues, expert witnesses).

In a 17-page declaration, Knapton explained that the ledger was prepared after he made numerous deletions and corrections from the original/reconstructed time records based on his understanding of the tasks and his expertise in reviewing time records for reasonableness. Knapton said that in making these deletions, he recognized that the original/reconstructed time records were in "poor form" and appeared to contain numerous inaccuracies. For example, Knapton deleted all time for Ronquillo while he was suspended from the practice of law and all of Bush's time between March 2004 and June 2007 because Bush could not reconstruct his time "with enough precision." Knapton stated: "The time by Mr. Chodzko and Mr. Sharkey was very detailed-but the others' time has been reconstructed as best they can and is LOW by several hundred hours in my opinion."

After this review and deletions of time, Knapton prepared the final ledger, showing 2,758.25 in attorney/paralegal hours spent on the case. Of this time, Knapton attributed 451.05 hours to Ronquillo and 1,153.35 hours to Corrales. All of Ronquillo's services were provided before June 2007. Knapton also opined that $451 was an appropriate blended rate for Cates's attorneys. He thus proposed a lodestar of $1,229,565.35.

In opposition to the motion, defendants submitted an expert declaration, in which the defense expert criticized numerous time entries for Ronquillo and Corrales as being excessive and inflated. Defendants also submitted documents showing that Ronquillo had been temporarily suspended from practice in 2004 and was disbarred in 2010 for stealing funds from a client trust fund.[3] Defendants also argued that there was insufficient evidentiary support for the hours reported because only one attorney had submitted a declaration (Bush) in the current proceedings. Based on these assertions, defendants argued that the court should "exercise its discretion to award *no* fees at all." (Italics added.)

In reply, Cates argued that Ronquillo's misconduct was not relevant to the fee request because the disciplinary actions were unrelated to his work in the Cates litigation, the fee request did not include any hours for Ronquillo during his 2004 suspension, Ronquillo had been substituted out of the case long before he was disbarred, and the conduct underlying the disbarment was unrelated to Cates's case.

After a hearing, the court reduced the allowable hours to 2,398 from the 2,758.25 hours identified by expert Knapton. This reduction included a 15 percent reduction in all of the time claimed for Corrales and Ronquillo

---

[3] This evidence showed the 30-day suspension in 2004 concerned conduct in 2000 to 2001 unrelated to Cates's case. The disbarment likewise arose from conduct unrelated to Cates's case.

because of the foundational and evidentiary problems with the reconstructed time records for these attorneys. But the court declined to adopt defendants' approach of refusing to award any fees for the hours spent by these attorneys. The court explained that it was undisputed that these attorneys had performed substantial work in the case for approximately four years and had achieved significant successes during that time, and thus it was appropriate to award at least a portion of the fees for their time. The court further reduced the attorney hours by certain other factors suggested by defendants' expert.

The court additionally found that the blended hourly rate of $451 was a reasonable rate for the attorneys, most of whom were highly experienced attorneys with more than 20 years of experience when the services were provided.

The court thus found Cates was entitled to a lodestar of $1,087,483 (2,398 attorney hours at a $451 blended hourly rate; plus 45 paralegal hours at a $133 hourly rate). As explained more fully below, the court also found that Cates was entitled to a positive multiplier of 1.85 based primarily on the contingent nature of the recovery. Although declining to apply Cates's alternative common fund theory, the court noted: "Here, the fee calculated on a lodestar-multiplier basis represents approximately 16 percent of the $12.8 million figure offered by plaintiff's counsel as a monetary measure of the benefit achieved. Certainly a 16-percent fee is not unreasonable and does not suggest that the fee should be reduced."

## B. *Legal Principles*

The California Supreme Court has instructed that attorney fee awards under section 1021.5 "should be fully compensatory," and absent "circumstances rendering the award unjust, an . . . award should ordinarily include compensation for *all* the hours *reasonably spent*." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133 [104. Cal.Rptr.2d 377, 17 P.3d 735].) In determining reasonable attorney fees under the lodestar method, the court first determines the number of hours reasonably expended by the attorneys and then multiplies this figure by the reasonable hourly rate prevailing in the community for similar work. (*Id.* at pp. 1131–1134.) Next, the court engages in the multiplier analysis, and determines whether the lodestar figure should be augmented or diminished by one or more relevant factors (discussed below). (*Id.* at p. 1132; *Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 154 [50 Cal.Rptr.3d 273] (*Graciano*).)

The determination of an appropriate statutory fee award is committed to the trial court's sound discretion and will not be reversed unless the court abused this discretion and the appellate court is " ' "convinced" ' " the ruling

is " ' "clearly wrong." ' " (*Ketchum v. Moses, supra,* 24 Cal.4th at p. 1132.) Trial judges are entrusted with this discretionary determination because they are in the best position to assess the value of the professional services provided in their courts. (*Id.* at p. 1132; accord, *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095–1096 [95 Cal.Rptr.2d 198, 997 P.2d 511].)

## C. *Lodestar Amount*

The Commission does not challenge the court's finding as to the blended hourly rate, but argues the court erred in "accepting and relying upon *any* of the reconstructed hours submitted for Ronquillo and Corrales, due to the inadequate evidentiary foundation to support the reconstructed time records."

The trial court expressly recognized the evidentiary problems with the documentation as to the Ronquillo and Corrales hours, and to respond to those problems, the court reduced the hours by 15 percent and eliminated various charges that it believed were inappropriate. But the court declined to further reduce the fee award because Bush's declaration and the extensive case files made clear that these two attorneys had provided substantial beneficial attorney services during the four years they represented Cates in this litigation. The court was also critical of the defense expert's failure to opine on a fair reduction amount for the documentation problems, noting that the expert's sole opinion was that *no* fees should be awarded for any work performed by Ronquillo and Corrales.

The court's ruling was a proper exercise of discretion. Certainly, it would have been preferable if the two attorneys had maintained contemporaneous records and had filed declarations in the fee litigation. However, the flaws in the supporting evidence did not mean the court was required as a matter of law to award *no* fees for the substantial work provided by these two attorneys. The record was undisputed that Ronquillo and Corrales provided the bulk of the attorney work from the inception of the case through the *Cates I* appeal. This work included substantial independent investigation, preparing and filing the lengthy complaint, substantial discovery (both propounding and responding), active motion practice, opposing several demurrers, opposing two summary judgment motions, and successfully bringing an appeal challenging one of the summary judgments.

Reconstruction of time records may be permissible for a fee motion if there is adequate information to reach reasonable estimates of the work described. (See *PLCM Group, Inc. v. Drexler, supra,* 22 Cal.4th at p. 1096, fn. 4; *Weber v. Langholz* (1995) 39 Cal.App.4th 1578, 1587 [46 Cal.Rptr.2d 677]; *Best v. California Apprenticeship Council* (1987) 193 Cal.App.3d 1448, 1470–1471 [240 Cal.Rptr. 1].) The court's conclusion as to the services

provided by Ronquillo and Corrales was based on a highly detailed reconstruction of time as to each specific legal task, an expert who reviewed the case files and analyzed whether these specific legal tasks and the amount of time identified for each task was reasonable, and the trial court's own analysis of the declarations and case files.

We reject the Commission's contentions the court erred because it is unclear who actually prepared the initial reconstructed records for Ronquillo's and Corrales's time. Even assuming these individuals did not participate in preparing the time records, there were sufficient checks to ensure the records were reliable, including the court's review of the attorneys' work product, Bush's detailed declaration summarizing the work, and Knapton's itemized reconstruction of the work hours based on his in-depth review of the pleadings, discovery, correspondence and Bush's declaration. Even before the court's 15 percent reduction, Knapton had already reduced the reconstructed time by approximately 400 hours, and had explained that the failure to maintain contemporaneous time records almost always results in underbilling rather than overbilling.

Based on the record before us, we conclude the court did not abuse its discretion in determining the lodestar amount.

## D. *Multiplier*

The Commission alternatively contends the court erred in applying a positive multiplier of 1.85 and argues the court instead should have adjusted the lodestar downward.

### 1. *General Principles*

In determining whether to apply a multiplier to a lodestar amount, a court should consider all relevant factors, including "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award." (*Ketchum v. Moses, supra*, 24 Cal.4th at p. 1132.) A court may rely on these factors to increase or decrease the lodestar. (*Graciano, supra*, 144 Cal.App.4th at pp. 160–161.) Any one factor may be sufficient to apply a positive or negative multiplier. (*Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 947 [20 Cal.Rptr.3d 485].)

"[T]he calculation of attorney fee enhancements [is a] highly fact-specific matter[] best left to the discretion of the trial court." (*Graham, supra*, 34 Cal.4th at p. 581; see *Krumme v. Mercury Ins. Co., supra*, 123 Cal.App.4th at

p. 947.) " ' "There is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation." [Citation.] There are numerous such factors, and their evaluation is entrusted to a trial court's sound discretion . . . .' " (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 901 [111 Cal.Rptr.3d 374].)

## 2. *Contingent Risk Factor*

In this case, the court enhanced the fee based primarily on the "contingent risk" factor, which is "[o]ne of the most common fee enhancers" and an important consideration in the multiplier analysis. (*Graham, supra*, 34 Cal.4th at p. 579.) " ' "A contingent fee must be higher than a fee for the same legal services paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services. . . ." "A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases." ' " (*Id.* at p. 580.)

## *Contingent Risk as Applied to Fees Incurred on Merits of Litigation*

In its appellate briefs, the Commission does not directly challenge the applicability of the contingent risk factor with respect to the fees incurred in litigating the merits of the lawsuit (through the stipulated dismissal). We agree that the court's reliance on this factor *for the fees incurred during the merits litigation* was reasonable and appropriate. Because Cates was challenging a governmental body's *failure to act* with respect to relatively new legislation and it was uncertain whether she would be successful in proving this claim in the face of defendants' broad discretionary authority, there was a genuine risk that a court would not ultimately find in Cates's favor. In this regard, Judge Dato specifically found that: "The mere fact that the trial court . . . *granted* summary judgment in favor of the State indicates that the risk to plaintiff's counsel was substantial. Indeed, it seems unlikely that any reasonable lawyer evaluating this case at the outset would have predicted even a 50-percent chance of ultimate success." Viewing the entirety of the case, this factual finding was reasonable, and did not constitute an abuse of discretion.

*Contingent Risk Factor as Applied to Attorney Fees Incurred
to Obtain Fees*

The Commission contends, however, that the court erred in enhancing the fees *incurred in litigating the attorney fee issues.*

In *Graham,* the California Supreme Court held that courts may apply an enhancement to services provided in attorney fees litigation, but admonished that courts should look carefully at the issue because "the enhancement justified for fees in the underlying litigation may differ from the enhancement warranted in the fee litigation." (*Graham, supra,* 34 Cal.4th at pp. 581–582.) In particular, the court held the contingent risk factor is generally inapplicable to fees for fees litigation. (*Id.* at pp. 583–584.) The court reasoned that the risk of not recovering in the attorney fees portion of the case is typically much lower than the risk in the merits litigation, and thus a lower multiplier will generally be appropriate on the contingency factor "*if one is given at all.*" (*Id.* at p. 583, italics added.) The high court noted that "[w]e do not believe a lower multiplier on fees for less risky fee litigation will deter attorneys from accepting worthwhile public interest cases." (*Ibid.*)

Citing *Graham,* the trial court specifically recognized that it had the "authority . . . [to] apply a lesser multiplier to attorney hours litigating the entitlement to a fee award rather than the underlying merits of the case." But the court found a reduction was not warranted in this particular case because defendants aggressively litigated Cates's right to fees and there was no certainty that Cates would prevail on the attorney fee issues, both with respect to entitlement and the award amount. The court stated: "[T]he vigorous arguments raised by the State both before Judge Oberholtzer and in this phase of the motion suggest that the risk of no fee award or a markedly reduced award was real and not merely theoretical."

The court's conclusion is supported with respect to the fees incurred on the issue of Cates's *entitlement* to fees. As reflected in the first portion of this opinion, there was a substantial risk that Cates would not prove her entitlement to fees under the catalyst theory. The link between Cates's lawsuit and the results obtained was dependent on a circumstantial evidence analysis and two reasonable judges could have reached different conclusions on the same facts. Moreover, there was a substantial legal and factual issue regarding whether the prelitigation settlement attempt requirement would bar *any* attorney fees recovery. Because Cates's entitlement to fees under the catalyst theory was in doubt and defendants aggressively and actively litigated the entitlement issues, the court did not err in finding there was a substantial risk of recovering *any* attorney fees in the case and thus that the incurred fees should be enhanced. The court's conclusion on this issue was reasonable and supported by the record.

However, we reach a different conclusion with respect to the contingent risk factor as applied to the attorney fees services incurred to prove the *amount* of the award. Generally, once a party proves entitlement to an attorney fee award, the risk of not obtaining fees is essentially eliminated. In the typical case, litigation regarding the reasonable amount of fees does not trigger any risk that the plaintiff will not recover an appropriate fee award. Cates suggests this case is different. She says the Commission vigorously argued, and submitted a supporting expert declaration, that Cates should receive *no* amount of attorney fees despite prevailing on the catalyst theory because her original attorneys did not keep contemporaneous time records, and the reconstructed records were incurably flawed given the prior attorneys' refusal or inability to provide necessary information for the fee application.

The Commission's argument regarding the inadequate foundation for Cates's attorney fees request—which may have been persuasive to some superior court judges—did create a substantial risk that Cates would obtain little or no fees. However, this risk cannot constitute the contingent risk supporting a positive multiplier on the fees litigation because the risk was created by, and solely the fault of, Cates's attorneys. It would be incongruous to permit plaintiff's own attorneys to generate the risk of not proving their attorney fees by keeping poor records and failing to assist in the preparation of the fee application and then to rely on this risk to argue that the lodestar amount should be *increased.* Given the totality of the circumstances, the Commission should not be charged with an enhanced fee award regarding the fee amount litigation based on the conduct of Cates's original attorneys. To the extent Cates argues that neither Ronquillo nor Corrales will obtain any portion of the award because these attorneys assigned their right to her new attorneys, that argument does not alter this analysis. An assignee stands in the shoes of an assignor, and takes his or her rights from the assignor and is subject to all defenses that are available against the assignor.[4]

The court erred by applying a positive multiplier on the attorney fees incurred to prove the reasonable amount of fees incurred in the case.

### 3. *Other Potentially Relevant Factors*

The Commission also argues the court abused its discretion because it failed to find that two *other* factors required the court to reduce the lodestar.

---

[4] We note the assignment document is not part of the record and the specific terms are not set forth in the record. Because the Attorney General did not raise any issues about the assignment at the trial court or on appeal, we do not consider the extent to which, if at all, this assignment, or its terms, may have been a relevant factor in establishing the lodestar and/or the right to a multiplier. The essential point for our analysis is that with respect to the assigned rights to fees, the subsequent attorneys' rights are wholly derivative of the rights of the two initial attorneys.

Under the applicable deferential review standard, this argument is without merit. The court explicitly considered each of these factors, and did not abuse its discretion in concluding these factors did not warrant a downward adjustment of the lodestar.

First, the Commission argues the court should have adjusted the lodestar downward to reflect "Cates's failure to obtain any of the relief sought in her complaint. . . ." However, as discussed, Cates did obtain the relief sought in her complaint. She obtained exactly what she was seeking—the Commission's proper monitoring and enforcement of the tribes' obligation to pay a percentage of their "net win" to the state. Further, although Judge Dato did not make a definitive finding that the $12.8 million was the direct result of Cates's lawsuit, he echoed Judge Oberholtzer's conclusion that Cates's lawsuit resulted in a substantial monetary recovery to the state. A lawsuit that successfully compels the state to fulfill its mandatory duties to identify and collect millions of dollars in delinquencies owed to the state is not, as the Commission suggests, a "narrow" victory.

Second, the Commission argues the court failed to apply a negative multiplier because defendants are public agencies. Without citing to any authority, the Commission says "[p]articularly in these difficult economic times, when it is commonly acknowledged that the State's budget is severely underfunded, a court should endeavor to reduce any award that would be paid out of the State's coffers."

The trial court found this circumstance was not a reasonable basis to reduce the award, emphasizing Judge Oberholtzer's findings that "as a result of the effort of plaintiff's counsel in this case, the state actually recovered" a significant amount of funds. The court's conclusion was not an abuse of discretion. (See *Rogel v. Lynwood Redevelopment Agency* (2011) 194 Cal.App.4th 1319, 1332 [125 Cal.Rptr.3d 267]; *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 400–401 [33 Cal.Rptr.3d 644].)

## DISPOSITION

We reverse the orders against the Controller. The court is to enter a new order finding in the Controller's favor on Cates's attorney fees motion.

We affirm the order finding Cates is entitled to recover attorney fees under a catalyst theory against the Commission. We reverse the order awarding Cates $2,011,844 in attorney fees. On remand, the court is to strike the enhancement with respect to the fees incurred in litigating the amount of the

attorney fees award. The court is then directed to issue a new order awarding fees against the Commission based on its prior lodestar and multiplier analysis, except that it should strike the multiplier on the portion of the award reflecting fees incurred in litigating the amount of the attorney fees award. The parties to bear their own costs on appeal.

O'Rourke, J., and Irion, J., concurred.

A petition for a rehearing was denied February 26, 2013, and appellants' petition for review by the Supreme Court was denied May 15, 2013, S209392.