Filed 5/11/23

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE KENNEDY COMMISSION,<br>    Plaintiff and Respondent,<br><br>v.<br><br>CITY OF HUNTINGTON BEACH et al.,<br>    Defendants and Appellants. | E078403 / E077888<br><br>(Super.Ct.No. 30-2015-00801675)<br><br>OPINION |

APPEAL from the Superior Court of Los Angeles County, Michael L. Stern, Judge. Affirmed.

Michael E. Gates, City Attorney, Michael J. Vigliotta, Chief Assistant City Attorney, Nadin S. Said and Lauren L. Rose, Deputy City Attorneys for Defendants and Appellants.

Community Legal Aid SoCal, Sarah Reisman, Erica Embree, Katelyn Rowe; Public Interest Law Project, Michael Rawson, Craig Castellanet; Public Law Center, Ugochi Anaebere-Nicholson, Richard Walker; Jones Day, Roman Darmer and Debbie Chen for Plaintiff and Respondent.

1

Defendants and appellants City of Huntington Beach (Huntington) and the City Council of Huntington Beach (City Council; collectively, the City) appeal the grant of attorney fees in the amount of $3,531,201.10 in favor of plaintiff and respondent The Kennedy Commission (Kennedy) for litigation pertaining to the City's housing element plan under California's Housing Element Law (Gov. Code, § 65580 et seq.). Prior to 2015, the City had adopted its 2013-2021 housing element (Housing Element), which identified sufficient sites to accommodate the City's Regional Housing Needs Allocation (RHNA) of lower-income housing mandated by California. This Housing Element was consistent with the general plan of the City. A majority of the units for low-income housing were set aside in an area known as the Beach Edinger Corridors Specific Plan (BECSP). The California Department of Housing and Community Development (HCD) approved the Housing Element. In 2015, after complaints from residents about the density in the BECSP, the City passed an amendment that significantly reduced the number of housing units that could be developed in the BECSP (Amended BECSP), thereby effectively eliminating sites for low-income housing in Huntington.

Kennedy advised the City that the Amended BECSP did not meet Huntington's requirement for their RHNA and it violated state law. Kennedy filed a petition for alternative writ of mandate and complaint for declaratory and injunctive relief (Petition) alleging in its first cause of action that the Amended BECSP was inconsistent with the Housing Element in violation of Government Code sections 65454, 65580, 65583, 65587 and 65860. Kennedy argued that the Amended BESCSP was void as it was not consistent with the Housing Element. The Petition included five other causes of action,

2

including, in the second cause of action, that the City must implement the Housing Element.  The City responded that they were amending the Housing Element to meet their RHNA and were seeking approval from the HCD.  The trial court applied Government Code section 65454, which requires a specific plan be consistent with the general plan, and declared the Amended BECSP was void because it conflicted with the general plan.  The trial court refused to order that the City had to implement the Housing Element as it was written.  Kennedy voluntarily dismissed all the other causes of action without prejudice.  The trial court also awarded Kennedy attorney fees as the prevailing party pursuant to Code of Civil Procedure section 1021.5[1] in the amount of $648,512.75 with a multiplier of 1.4.

In the first appeal filed with this court, *Kennedy Comm'n v. City of Huntington Beach* (2017) 16 Cal.App.5th 841 (*Kennedy*)), we reversed the Petition based on Huntington Beach being a charter city.  At the time, Government Code section 65700 exempted charter cities from the requirement of consistent housing elements.[2]  We remanded for Kennedy to pursue its other causes of action raised in the Petition.  The City also filed a separate appeal from the award of attorney fees.

---

[1]  All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2]  In 2018, the Legislature passed Senate Bill 1333 (Stats. 2018 ch. 856, § 3, eff. Jan. 1, 2019) (SB 1333) which eliminated the loophole for charter cities.  It amended Government Code section 65700 to provide in subdivision (b) as follows: "Notwithstanding subdivision (a), paragraph (2) of subdivision (a) of Section 65400, Sections 65300.5, 65301.5, 65359, 65450, 65454, 65455, 65460.8, 65590, and 65590.1, and Article 10.6 (commencing with Section 65580) shall be applicable to charter cities."

3

In our second opinion (*Kennedy Comm'n v. City of Huntington Beach* (Oct. 31, 2017, E066605) [nonpub. opn.]) we reversed the award of attorney fees to Kennedy based on it no longer being the prevailing party. We noted that Kennedy may have an argument that they were entitled to attorney fees under a catalyst theory.

Upon remand, Kennedy filed its First Amended Petition for Alternative Writ of Mandate and Complaint for Declaratory Relief (FAP) and pursued litigation. On February 3, 2020, the City adopted amendments to the Housing Element, which were approved by the HCD. The new housing element (Housing Element II) set aside units for low-income housing in various areas of Huntington—not concentrated in the BECSP—to meet its RHNA. Kennedy and the City stipulated to the dismissal of Kennedy's FAP but agreed that Kennedy could pursue attorney fees.

In January 2021, Kennedy filed its motion for attorney fees pursuant to section 1021.5 claiming that it was entitled to attorney fees under the catalyst theory. The trial court awarded Kennedy $2,522,286.50 in fees and included a 1.4 multiplier, for a total award of $3,531,201.10.

The City raises the following issues on appeal:

1. The trial court erred in awarding Kennedy attorney fees pursuant to section 1021.5 based on the catalyst theory.

2. The trial court erred by finding the lawsuit filed by Kennedy met the statutory requirements of section 1021.5.

3. The trial court issued an excessive attorney fee award as the fees were not reasonable; Kennedy should not be reimbursed for fees incurred both before and after this

4

court's opinion in *Kennedy*, *supra*, 16 Cal.App.5th 841; and the trial court erred by applying a multiplier of 1.4.

4. The trial court erred by entering judgment against the City on August 23, 2021.

## FACTUAL AND PROCEDURAL HISTORY

A. <u>CASE NO. E065358—FILING OF PETITION FOR WRIT OF MANDATE</u>

The City had a general plan for the development of Huntington. Government Code section 65580 requires every city and county to adopt and update a housing element as part of the general plan. The housing element must assess the local housing need and implement programs to remove constraints and promote development. The housing element must be periodically updated and "subject to review" by the HCD. According to Government Code section 65584, the HCD determines the RHNA for each region of California. (*Kennedy*, *supra*, 16 Cal.App.5th at p. 845.)

On September 16, 2013, the City adopted the Housing Element for the period of 2013 through 2021. The Housing Element stated that it would facilitate and encourage the development of affordable housing in the BECSP. The BECSP was a 459-acre area in Huntington Beach. The Housing Element would allow for multi-family, high-density housing. The Housing Element also provided for a streamlined review of projects in the BECSP. It included the RHNA amount of housing for low income, which at the time was 1,353 units. This was allocated between very low income (313 units), low income (220 units), moderate (248 units), and above moderate (572 units). The Housing Element was

5

approved by the HCD on November 12, 2013.  (*Kennedy*, *supra*, 16 Cal.App.5th at p. 845.)

In 2015, in response to citizen complaints that the area was developing too fast, the City sought to amend the BECSP to reduce the total amount of new development from 4,500 units to 2,100 units, most of which were not set aside for lower-income housing.  (*Kennedy*, *supra*, 16 Cal.App.5th at p. 846.)

On March 24, 2015, Kennedy contacted the City and notified them that the Amended BECSP violated the Housing Element and that they would not meet the RHNA.  In addition, the HCD sent a letter to the City indicating that the Amended BECSP was "inconsistent with the policies and programs within the City's adopted housing element."  Despite these warnings, the Amended BECSP was passed on May 4, 2015. (*Kennedy*, *supra*, 16 Cal.App.5th at p. 846.)  The HCD advised the City that the Amended BECSP no longer complied with state law and the prior certification of the Housing Element was withdrawn.  The City advised the HCD that they were in the process of reviewing and revising the Housing Element.  (*Ibid.*)

On July 31, 2015, Kennedy filed its Petition in Orange County Superior Court. (*Kennedy*, *supra*, 16 Cal.App.5th at p. 844.)  The plaintiffs included Kennedy and additional plaintiffs William Adams and Jason Puleo who both could not find affordable housing in Huntington Beach.  (*Id.* at p. 845.)

The first cause of action in the Petition was for Failure to Act Consistently with the Housing Element.  Kennedy cited Government Code sections 65454, 65580, 65583, 65587, and 65860.  Relying on Government Code section 65454, the Petition alleged that

6

a specific plan, which here was the Amended BECSP, could be not adopted unless it was consistent with the general plan. The Housing Element in the general plan complied with the RHNA; the Amended BECSP was not consistent and reduced the number of low-income housing units. Kennedy alleged it had standing because it was "directly and beneficially" interested in the City's compliance with all applicable provisions of law. There was no other plain, speedy or adequate remedy. (*Kennedy*, *supra*, 16 Cal.App.5th at p. 846.)

The second cause of action relied upon Government Code sections 65581, 85583, 65587 and 65588. It sought a writ of mandate requiring the City to implement the approved Housing Element. The third and fourth causes of action were based on Article XI, section 7 of the California Constitution. The Amended BECSP conflicted with state law and was therefore preempted. Further, the Amended BECSP violated due process. The fifth cause of action alleged unlawful housing discrimination under section 12900 as failing to provide low-income housing had a discriminatory effect. (*Kennedy*, *supra*, 16 Cal.App.5th at p. 847.) The sixth cause of action was for a violation of Government Code section 65008. Kennedy alleged that they "believed" that persons who need affordable housing in Huntington Beach were disproportionately racial and ethnic minorities. The Amended BECSP had a discriminatory purpose and effect on the production of affordable housing. (*Kennedy*, at p. 847.) The Petition was verified by both Puleo and Adams.

On August 28, 2015, the case was transferred to Los Angeles Superior Court. On October 20, 2015, Kennedy filed a memorandum of points and authorities to support the

7

Petition. It argued that it brought the Petition to invalidate the Amended BECSP because it violated the Housing Element and state housing law. The Amended BECSP should be voided and the City ordered to comply with its existing Housing Element already approved by the HCD. (*Kennedy*, *supra*, 16 Cal.App.5th at p. 847.) On June 23, 2015, the City was advised by the HCD to "immediately" submit an amended Housing Element because it no longer complied with state housing law. (*Ibid.*)

On September 4, 2015, Kennedy filed a request to expedite the hearing on the Petition. The City objected as they needed time to prepare and they were attempting to amend the Housing Element. The trial court granted the expedited hearing date on the Petition. (*Kennedy*, *supra*, 16 Cal.App.5th at p. 848.)

The City filed its opposition to the Petition on October 29, 2015. The City argued they were actively working to amend the Housing Element to meet the RHNA goals, which did not necessarily mean that the Amended BECSP had to be rescinded. On September 15, 2015, the proposed amendment to the Housing Element was submitted to the HCD and included a list of all the sites for affordable housing. The City sent Kennedy the proposed amendment to the Housing Element on September 17, 2015. All the proposed affordable housing sites were outside the BECSP area. The City requested the HCD comment on the draft by November 10, 2015. The amendment to the Housing Element had not been approved as of the filing of the opposition. (*Kennedy*, *supra*, 16 Cal.App.5th at pp. 848-849.)

Kennedy filed a reply to the opposition. Kennedy noted that in the opposition, the City conceded they were out of compliance with state law in that the Amended BECSP

8

did not comply with the Housing Element. Kennedy argued the Amended BECSP was invalid. Kennedy was concerned that the City would not amend the Housing Element in a timely fashion or that the newly proposed affordable housing areas would not provide the lost units in the BECSP. Kennedy sought to have the Amended BECSP voided. (*Kennedy*, *supra*, 16 Cal.App.5th at p. 849.)

The matter was heard on November 12, 2015. The trial court adopted its tentative ruling without a hearing. Relying on Government Code sections 65454 and 65860, the trial court found that once a jurisdiction adopts a general plan including a housing element and obtains approval from HCD, the jurisdiction is prohibited from adopting a specific plan that is inconsistent with the general plan, including its housing element. (*Kennedy*, *supra*, 16 Cal.App.5th at p. 850.)

The trial court noted Kennedy's argument was that the Amended BECSP was inconsistent with the Housing Element. The trial court noted that despite the fact that the City was actively working to amend the Housing Element, the Amended BECSP was inconsistent with the general plan at the time it was passed and was therefore void as of the time it was passed. (*Ibid.*)

The trial court concluded, " 'The petition for writ of mandate is granted. The BECSP Amendment is void *ab initio*. A writ shall issue directing the City to cease enforcing, administering, or implementing the BECSP Amendment. The writ will not include any relief compelling the City to implement the 2013 Housing Element, the BECSP, or BECSP's Policies and Programs committing the City to accommodate its RHNA.' " (*Kennedy*, *supra*, 16 Cal.App.5th at pp. 850-851.) Kennedy dismissed the

9

other causes of action without prejudice on January 15, 2016, and the writ was issued voiding the Amended BECSP. (*Id.* at p. 851.)

This Court found on appeal that Government Code sections 65454 and 65860 did not apply to Huntington because it was a charter city, which was exempt from this consistency requirement pursuant to Government Code section 65700. The City did not have to comply with the consistency requirement. We noted that our decision only applied to the first cause of action. The writ was reversed but we provided that Kennedy should be given an opportunity to address the remaining issues. (*Kennedy*, *supra*, 16 Cal.App.5th at pp. 851-860.)

### B.     CASE NO.  E066605—ATTORNEY FEES

In a separate appeal, the City appealed the award of attorney fees to Kennedy. In the trial court, after the writ was granted, Kennedy filed a motion for attorney fees to be awarded pursuant to section 1021.5 for successful litigation enforcing important rights affecting the public interest. The City filed opposition in the trial court contending that they were already in the process of amending the Housing Element prior to the litigation. Further, the City argued the fees requested were "outrageously unreasonable." The trial court awarded $648,512.75 in attorney fees to Kennedy. The trial court awarded $281,644.25 to the Jones Day Law Firm and $199,005.50 to the Public Interest Law Project. The award included a multiplier of 1.4 in the amount of $174,696. It also included $37,075 for the preparation of the motion for attorney fees.

On appeal, we reversed the award of attorney fees pursuant to section 1021.5 based on the reversal of the granting of the writ. We noted, however, that Kennedy may

be entitled to attorney fees based on the catalyst theory. We stated that if Kennedy chose not to proceed on the other causes of action, it could file a new motion for attorney fees in accordance with our opinion. We expressed no opinion as to the proper resolution.

C.     FILINGS UPON REMAND

On March 7, 2016, the City Council voted against adopting a new housing element that had been drafted. On March 15, 2018, the trial court (Los Angeles Superior Court) granted Kennedy leave to file the FAP. The FAP was filed on March 20, 2018. Kennedy stated it brought the action in order for the City to comply with its own Housing Element and for the City to fulfill legal obligations under state law. The FAP included Adams and Puleo. The FAP alleged causes of action two through six. This included that the City be required to adopt its 2013 Housing Element; the 2013 Housing Element and Amended BECSP conflicted with state law and violated due process; unlawful housing discrimination; and a violation of Government Code section 65008. Kennedy sought to have the BECSP declared void and require that the City implement the Housing Element. Kennedy sought an award of attorney fees.

The City filed a demurrer to the FAP. Kennedy filed opposition. On June 7, 2018, the trial court overruled the demurrer and ordered that the City file a response to the FAP. The matter was set for a case management conference on July 23, 2018. On July 10, 2018, the City filed its answer to the FAP[3]. Trial was set for February 18, 2020.

---

[3] The City filed a petition for writ of mandate in this court to address the denial of the demurrer based on Kennedy raising in their second cause of action in the FAP that the City had to implement the Housing Element. The City sought a stay of the final status

*[footnote continued on next page]*

11

On January 25, 2019, the HCD filed a lawsuit against the City for failing to adopt a legally compliant housing element for the 2013-2021 planning period. On July 24, 2019, Richard M. Walker brought a request to withdraw as counsel for Adams because Adams was deceased. In addition, counsel for Puleo sought to be relieved because Puleo could not be located. He was relieved on July 9, 2020.

On February 3, 2020, while the parties were preparing for trial, the City adopted an amendment to the Housing Element, the Housing Element II. On September 10, 2020, Kennedy and the City stipulated to dismiss Kennedy's FAP without prejudice. The parties stipulated that Kennedy would file a motion for attorney fees with supporting documentation within 120 days of entry of the trial court's order dismissing the case. The trial court signed the stipulation and order on September 10, 2020.

D.     MOTION FOR ATTORNEY FEES

Kennedy filed a "Notice of Motion and Motion for Attorney's Fees under California Code of Civil Procedure § 1021.5" (Motion). Kennedy stated that in February 2020, the City had amended their Housing Element to comply with state law. Kennedy claimed that the lawsuit it filed was the catalyst of the City's compliance with the RHNA requirement and they were therefore entitled to an award of attorney fees.

Kennedy filed points and authorities in support of the Motion. Kennedy argued that it was the catalyst for the changes to the Housing Element. Kennedy insisted it tried

conference and trial dates on November 21, 2018, pending resolution of their petition for writ of mandate. We found that Kennedy could not raise the issue because it had been rejected by the trial court when it granted the Petition and Kennedy never appealed the ruling.

to avoid litigation by sending a warning letter to the City on June 25, 2015.  The City responded that they were in the process of reviewing and revising the Housing Element. Kennedy found that just stating they were working on amending the Housing Element was not sufficient, and Kennedy filed the Petition on July 31, 2015.  Kennedy noted that after this court's opinion in *Kennedy*, *supra*, 16 Cal.App.5th 841, the Legislature enacted SB 1333 to close the loophole for charter cities.  This lawsuit was the catalyst for SB 1333.

Kennedy insisted it again tried to settle with the City after filing the FAP.  HCD finally got involved and filed its lawsuit against the City because the Housing Element violated state law.  Kennedy intervened to assist the HCD but stated it was not asking to be compensated for this time.  The parties agreed to attend mediation in November 2019. The City then advised Kennedy they were seeking to amend the Housing Element and the Housing Element II was adopted in February 2020.

Kennedy insisted there was "no doubt" that the lawsuit was the catalyst for the City amending the Housing Element.  The lawsuit did not have to be the only reason for the change; just a "substantial factor."  Further, this court's opinion led to the enactment of SB 1333.  Kennedy insisted that private enforcement was necessary because the HCD waited three years to file a lawsuit.  Further, the hourly rate and number of hours spent by each of the attorneys were reasonable.

Kennedy was also seeking a 1.4 multiplier.  Kennedy argued that few attorneys possessed the skill or knowledge of the law in this area and the award of fees would go to its organization, which was funded solely by charitable contributions.  Kennedy sought a

13

total of $2,522,286.50 enhanced by a 1.4 multiplier for a total of 3,531,201.10.  Kennedy estimated $133,965.75 for filing the Motion.

Kennedy provided several declarations from attorneys who worked on the case. These attorneys included Roman Darmer, Craig Castellanet, Michael Rawson, Ugochi Anaebere-Nicholson, Michelle Kotval, and Carol Sobel.  Each attorney provided detailed billings of time spent on the case.

Anaebere-Nicholson was an attorney employed by the Public Law Center (PLC), which was a nonprofit legal services organization located in Orange County.  PLC was committed to providing access to justice for low income Orange County residents.  The PLC did not expect compensation from Kennedy and their attorneys worked on all phases of the litigation.  PLC incurred attorney fees in the amount of $567,873 from May 2015 through January 2020.  Eight different attorneys had handled the case based on staffing changes.  Their hourly rates ranged from $475 per hour to $910 per hour.  The declaration included the qualifications of each attorney.  PLC was seeking an hourly rate of $592 for all attorney work.  A detail of the hours, which totaled 959.30, was included with the declaration.

Rawson also provided a declaration.  He was the founder and co-director of the Public Interest Law Project.  Rawson helped draft SB 1333 after the appellate decision. He was a specialist with considerable experience in affordable housing law and policy. Rawson served as co-counsel with Craig Castellanet, who was the principal attorney assigned to the case to assist Kennedy in the litigation.  Rawson sought an hourly rate of

14

$900. All fees awarded would go to the Public Interest Law Project to support affordable housing litigation.

Sobel was a private attorney. Her declaration addressed whether the rates sought in the Motion were reasonable. She cited numerous similar cases in which she had been involved and similar fees were awarded. She concluded that the rates sought in this case were far lower than rates approved for attorneys of comparable skill, experience and reputation in the Los Angeles area. The rates were reasonable for the Orange County legal market. Sobel provided numerous supporting cases.

Darmer also filed a declaration in support of the Motion. Darmer was an attorney employed by the Jones Day law firm, which had represented Kennedy pro bono for five years. Darmer stated that attorneys employed by Jones Day had incurred at least $832,857.50 in attorney fees over the life of the case. Their billing rates ranged between $400 an hour to $1,125 an hour. They were not requesting any fees after January 24, 2020, and did not include any fees for their assistance in the HCD lawsuit. The exact fees for preparing the Motion had not been calculated but Darmer anticipated that it would total $85,043.75.

Darmer attached numerous exhibits to his declaration. These included the Housing Element, the Petition and the Amended BECSP. Darmer attached numerous letters sent to the City from Kennedy advising the City that the Amended BECSP violated state law and advising the City must meet their RHNA. Also included was a letter from the City dated July 8, 2015, that the City was actively working on amending the Housing Element. Kennedy responded that it is not enough to just contact someone

15

to work on the Housing Element; the City had to take action. On August 26, 2015, the City sent a letter "to offer terms by which to settle this case." Kennedy rejected the settlement offer on September 8, 2015, and filed the Petition. Darmer's declaration also had attached settlement negotiations, which occurred after the filing of the FAP. The City initiated a settlement discussion on April 11, 2018.

Darmer also included with the Motion the HCD lawsuit against the City that was filed on January 25, 2019. Darmer also included a transcript of a November 4, 2019, meeting of the City Council. City staff provided that without an approved housing element, the City was not eligible for SB-2 funding, which was state funding that helped cities with homelessness issues. Staff recommended an amendment to the Housing Element that would identify seven sites for the development of lower-income housing. Only two percent of the low-income housing would be in the BECSP. The City Council approved preparing a new housing element.

Kennedy sent a letter to the City that they were happy that a new housing element would be submitted for approval but did not agree it mooted its lawsuit. On November 6, 2019, Kennedy agreed to postpone the mediation scheduled for the FAP. Darmer's declaration also included the text of SB 1333 in which the Legislature referred to *Kennedy*, *supra*, 16 Cal.App.5th 841.

A transcript of the City Council's meeting on January 14, 2020, was included with Darmer's declaration. Staff stated that the catalyst for getting an approved housing element was to obtain SB-2 homelessness funding. HCD had seen the Housing Element II and stated it would be approved. Darmer's declaration also included emails from

16

Kennedy regarding depositions and other discovery on the FAP. The Housing Element II was adopted in February 2020. Darmer's declaration included a detail of the hours expended on the case.

Castellanet also filed a declaration in support of the Motion. He was employed by the Public Interest Law Project. His reasonable rate was $815 an hour. He was awarded $620 an hour in 2016 in this case. He had been co-counsel since 2015 and he detailed his work in the case. He provided his and Rawson's hours.

Kotval filed a declaration in support of the Motion. She was employed by Community Legal Aid SoCal and was an attorney of record for Kennedy. Kotval was involved in the appellate, post-appellate and settlement stages of the litigation. Community Legal Aid SoCal was seeking $698,812 in attorney fees. Any fees awarded would inure to the benefit of Community Legal Aid SoCal. The time period they were on the case was from January 2017 through January 2020. She set forth in detail the hours worked by Community Legal Aid Socal.

E.      OPPOSITION TO THE MOTION

The City filed opposition to the Motion (Opposition). The City argued the focus of the Petition was to have the Amended BECSP declared void. Kennedy's litigation was not focused on finding other alternatives for the City to meet its RHNA. Kennedy was not a successful party as the City adopted the Housing Element II and did not void the Amended BECSP. The recent amendments to the Housing Element were not as a result of the Kennedy lawsuit. The City also argued that Kennedy was seeking a "fortune" in

17

attorney fees. The City insisted that litigation was not the catalyst for anything that was done by the City. The City amended its Housing Element to obtain SB 2 funding.

The City argued that Kennedy had not made reasonable efforts to settle the case as required under section 1021.5. Further, the City noted that they had raised the issue of charter cities for the first time on appeal, not Kennedy. Kennedy had nothing to do with the passage of SB 1333 as it was the City that raised the issue of charter cities in the appeal. Further, the requested fees were not reasonable and were "unfairly inflated." The City argued that a multiplier was not warranted in the case.

Pancy Lin filed a declaration. She was a Senior Deputy City Attorney with the Huntington city attorney's office. She noted that from 2015 to December 2018, 14 attorneys from four different organizations had billed a total of 2,320.65 hours in this case on behalf of Kennedy. Lin provided Exhibit D, which contained specific objections to the bills provided. Lin insisted that there was improper time billed, duplicative billings, "Block Billing" and vague time reported.

A declaration prepared by Jennifer Villasenor on October 29, 2015, was filed in support of the Opposition. She was a planning manager employed by Huntington's Planning and Building Department. Immediately after the Amended BECSP was approved, the City hired a housing element consultant to amend the Housing Element. The consultant worked with HCD to amend the Housing Element. A "study session" seeking public comment on ways to amend the Housing Element was conducted in September 2015. Amendments to the Housing Element were drafted and they were

discussing approval in October 2015. The City also filed objections to the evidence presented by Kennedy to support the Motion.

F.      REPLY TO OPPOSITION TO THE MOTION

Kennedy filed a reply to the Opposition. Kennedy insisted that its lawsuit was the "substantial factor" for the change in the adoption of the Housing Element II. There was no evidence that the City's sole reason for changing the Housing Element was to obtain SB-2 funding. Kennedy referred to statements made during a hearing by Council member Patrick Brenden in which he specifically referred to the lawsuit in the discussion regarding amending the Housing Element. Kennedy argued the purpose of the lawsuit was to ensure low-income housing in Huntington, which was achieved by the adoption of the Housing Element II, which complied with state law.

Moreover, Kennedy tried to settle the case beginning in March 2015, continuing until they filed the Petition. Kennedy also insisted that the requested attorney fees were reasonable. The trial court was not required to examine each detailed facet of the representation. The rates requested were reasonable.

Darmer filed a supplemental declaration in support of the reply to the Opposition. Kennedy was seeking $81,553.75 in attorney fees for the preparation of the Motion. Darmer and his associates had increased their hourly rates for work performed in 2021. Darmer attached copies of the timesheets. Darmer provided detailed hourly billings from November 12, 2020, through March 12, 2021.

Anaebere-Nicholson also filed a supplemental declaration. PLC sought $10,650 for the preparation of the Motion. She detailed the time spent on the Motion. Castellanet

19

filed a supplemental declaration on behalf of the Public Interest Law Project. They were seeking $19,041 for the Motion and detailed the time spent on the Motion. Erica Embree and Lauren Smith filed declarations on behalf of the Community Legal Aid Socal. They were seeking $21,015 for their hours spent preparing the Motion. Each detailed their hours spent. Smith declared the City had never requested SB-2 funds from the HCD after the Housing Element II was approved.

Kennedy filed a response to the City's objections to the evidence supporting the Motion. Kennedy also filed objections to Lin's declaration.

F.       TRIAL COURT'S RULING ON THE MOTION

The trial court heard the Motion on April 12, 2021, and took the matter under submission. Kennedy argued the requirements of section 1021.5 had been met. Kennedy's lawsuit was a substantial factor in the City amending the Housing Element. Kennedy argued the catalyst theory was to be applied in a "broad pragmatic manner." In addition, the attorney fees requested were reasonable. Kennedy had already eliminated 500 hours of time from its fee request. In arguing for the multiplier, Kennedy insisted that only a few attorneys possessed the knowledge required for the issues in the case. Moreover, the award of fees would go to public interest organizations.

The City responded that Kennedy's lawsuit was a "nuisance" and not a catalyst for anything the City did in the case. In fact, the lawsuit stalled some of the City's plans to amend the Housing Element. The City insisted that they only amended the Housing Element in order to receive SB-2 funding. The City also argued that the City had obtained over $600,000 in SB-2 funding since the Housing Element II was approved.

20

Further, the Kennedy lawsuit was solely about voiding the Amended BECSP, which never happened. Kennedy was entitled to no attorney fees in this case. Kennedy's counsel responded that HCD would have never sued the City if not for SB 1333, which was a result of the lawsuit.

The trial court issued a detailed written ruling on the Motion. The trial court stated it had reviewed all of the filings by the parties. The trial court noted that Kennedy sought fees on the catalyst theory and set forth the requirements for finding an award of fees was appropriate under a catalyst theory. The trial court found, "The Kennedy lawsuit was the catalyst that changed longstanding California law. The statutory revision also mooted the City's central defense to the lawsuit and enabled the Kennedy Commission to achieve objectives and become the prevailing party in this action." The trial court noted that City officials acknowledged the lawsuit in amending the Housing Element. "Those comments underscore that Kennedy Commission was the 'successful' and 'prevailing party' in achieving its primary objective since its persistence in this lawsuit caused the City to change 'it[s] behavior substantially because of, and in the manner sought by, the litigation.' " Kennedy accomplished its primary objective.

Further, Kennedy's lawsuit was meritorious and not frivolous. Kennedy was successful in expanding low-income housing in Huntington. The record supported that Kennedy made numerous attempts to settle the matter. In addition, Kennedy enforced an important right and conferred a significant benefit on the general public. The trial court found that without Kennedy's lawsuit, the law exempting charter cities would not have changed.

21

As for whether the requested attorney fees were reasonable, the trial court stated it had "reviewed, line-by-line, the declarations by Kennedy Commission attorneys in support of this attorneys' fees request. The legal work set forth in these lengthy declarations and attached hourly time records are reasonable not outside those often expended in such protracted litigation." The trial court also referred to the "strenuous opposition" by the City that required "every ounce of energy expended" by the attorneys representing Kennedy.

In addressing the multiplier, the trial court stated, "[T]he legal struggle to prevail upon the City to enact measures to deal with the homelessness in and around its community required exceptional work by dedicated volunteer attorneys who employed their capabilities in the public interest over many years to finally attain a desired outcome. Therefore, an enhancement multiplier of 1.4 is fully justified."

The trial court awarded attorney fees in the amount of $3,531,201.10. The judgment was signed on August 23, 2021.

## DISCUSSION[4]

A.      CATALYST THEORY

Kennedy relied solely on the catalyst theory as the grounds for an award of attorney fees in this case. The City contends the sole objective of the Petition and the

---

**4** The City filed a request for judicial notice on May 5, 2022, seeking to have several documents added to the record on appeal that were not before the trial court. Kennedy filed opposition to the request for judicial notice. We deny the request for judicial notice and will not consider that evidence in resolving the issues on appeal. We also will not address any arguments that rely on such evidence.

22

FAP was to have the Amended BECSP found to be void. Since the Amended BECSP has never been voided, Kennedy's lawsuit was not the catalyst for the determination by the City to adopt the Housing Element II to comply with state law. Kennedy insists the litigation and change in the law was the catalyst for the change that the City eventually made to the Housing Element.

1. *GENERAL PRINCIPLES*

Section 1021.5 provides in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

"California courts have long held an attorney fees award under section 1021.5 may be justified 'even when plaintiff's legal action does not result in a favorable final judgment' if there is 'a causal connection between the plaintiff['s] lawsuit and the relief obtained.' " (*Cates v. Chiang* (2013) 213 Cal.App.4th 791, 806 (*Cates*).) This is known as the catalyst theory. "The catalyst theory is an application of the principle that courts look to the practical impact of the litigation, not the manner of its resolution." (*Department of Water Resources Environmental Impact Cases* (2022) 79 Cal.App.5th 556, 571.)

23

"[S]trong policy reasons favor[] the continued application of the catalyst theory, which include encouraging public interest litigation and ensuring that attorneys who successfully bring lawsuits protecting the public interest are properly compensated." (*Cates*, *supra*, 213 Cal.App.4th at p. 806.)

"Under the catalyst theory, attorney fees may be awarded even when litigation does not result in a judicial resolution if the defendant changes its behavior substantially because of, and in the manner sought by, the litigation." (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 560 (*Graham*).) "To encourage suits enforcing important public policies, our Supreme Court has taken 'a broad, pragmatic view of what constitutes a "successful party." "Our prior cases uniformly explain that an attorney fee award may be justified even when plaintiffs legal action does not result in a favorable final judgment." ' (*Godinez v. Schwarzenegger* (2005) 132 Cal.App.4th 73, 89.)

However, to "discourage extortionate lawsuits 'without putting a damper on lawsuits that genuinely provide a public benefit' the court [has] adopted two 'sensible limitations on the catalyst theory.' " (*Cates*, *supra*, 213 Cal.App.4th at pp. 806-807.) First, "[t]he trial court must determine that the lawsuit is not 'frivolous, unreasonable or groundless' [citation], in other words that its result was achieved 'by threat of victory, not by dint of nuisance and threat of expense.' " (*Graham*, *supra*, 34 Cal.4th. at p. 575.) Second, "the plaintiff must have engaged in a reasonable attempt to settle its dispute with the defendant prior to litigation." (*Id.* at pp. 560-561.)

"Generally, whether a party has met the statutory requirements for an award of attorney fees is best decided by the trial court, whose decision we review for abuse of

24

discretion. [Citation.] Although this standard is deferential, a court abuses its discretion where no reasonable basis for the action is shown. [Citations.] [¶] To determine whether the trial court abused its discretion, we must review the entire record, paying particular attention to the trial court's stated reasons in denying or awarding attorney fees and whether it applied the proper standards of law in reaching its decision." (*Coalition for a Sustainable Future in Yucaipa v. City of Yucaipa* (2015) 238 Cal.App.4th 513, 519-520, fn. omitted; see also *Wal-Mart Real Estate Business Trust v. City Council of San Marcos* (2005) 132 Cal.App.4th 614, 620.) "The trial judge is considered to be in the best position to determine whether the criteria have been met, and its determinations will not be disturbed 'unless the appellate court is convinced that it is clearly wrong.' " (*County of Orange v. Barratt American, Inc.* (2007) 150 Cal.App.4th 420, 441.)[5]

## 2.  *CAUSAL CONNECTION FACTOR OF CATALYST THEORY*

In order to satisfy the causation prong of the catalyst theory, Kennedy does not have to show that "litigation [was] *the only cause* of defendant's acquiescence. Rather, [the] litigation need only be a substantial factor contributing to the defendant's action." (*Hogar v. Community Development Commission of the City of Escondido* (2007) 157 Cal.App.4th 1358, 1365.) "In conducting the causation analysis, ' " '[t]he appropriate benchmarks are (a) the situation immediately prior to the commencement of suit, and (b)

---

[5]  The City contends review in this case is de novo because the trial court applied the law incorrectly. In its ruling, the trial court reviewed the relevant law and applied it to the facts of the case. Review in this case is for an abuse of discretion.

the situation today, and the role, if any, played by the litigation in effecting any changes between the two.' " ' " (*Cates*, *supra*, 213 Cal.App.4th at p. 808.)

The trial court's conclusion that Kennedy's lawsuit was a catalyst for the eventual amendment to the Housing Element in order for the City to meet its RHNA is not "clearly wrong." Here, Kennedy achieved its primary objective of the City complying with their RHNA.

Kennedy became involved in the litigation when the City passed the Amended BECSP, which essentially eliminated the development of low-income housing in Huntington Beach. Kennedy notified the City that such amendment violated their mandated RHNA. While the City stated that they had already hired a consultant to prepare a new housing element when the Petition was filed, they had not approved a new housing element and set no timeline to comply with the RHNA. In the Petition, Kennedy not only sought to void the Amended BECSP but also had causes of action that related to implementation of the Housing Element and violations of the rights of Huntington's residents for failing to provide sufficient low-income housing.

After this court found that the theory upon which the trial court relied in granting the Petition—that the Amended BECSP was not consistent with the general plan—was improper because it was not applicable to charter cities, Kennedy proceeded with its lawsuit on the other theories in the Petition. At that point, the City, having successfully defended the Petition, had not amended the Housing Element to provide its RHNA. In fact, the City Council rejected a draft of an amended housing element in 2016. Kennedy's attorneys helped with the passage of SB 1333, which eliminated the

26

exemption for charter cities. Kennedy continued with its lawsuit in order to ensure that the City met its RHNA requirement without delay. Kennedy voluntarily dismissed the FAP once the City passed the Housing Element II, which met its RHNA.

The City insists that Kennedy's lawsuit neither changed the City's behavior nor achieved its primary objective or relief. The City insists the primary goal of Kennedy's lawsuit was to void the Amended BECSP and this goal was never achieved. However, the trial court found that "the objective and primary relief sought by the nonprofit Kennedy Commission efforts, both informally and through litigation, were to increase the number of available low-income housing units in the City."

The trial court did not abuse its discretion by concluding that the clear goal of the litigation was to ensure that the City met its requirement of providing low-income housing. In the Petition, Kennedy sought not only to void the Amended BECSP but also to ensure that the City met "its legal obligations under state housing law." Its third cause of action, preemption, specifically provided that under state housing element law, the City was required to meet its RHNA. The primary relief sought by the litigation in this case was that the City meet its lower-income housing requirement. The Petition alleged the best way to meet this goal was to void the Amended BECSP, but the goal of the litigation was that the City must meet its RHNA. This is evidenced by Kennedy immediately agreeing to dismiss the FAP once the City had met its RHNA by adopting the Housing Element II. Voiding the BECSP was merely the means by which Kennedy's goal of obtaining low-income housing for Huntington's residents could be accomplished, but Kennedy's purpose was for the City to meet its RHNA, a goal that was achieved.

27

The City insists the fact Kennedy dismissed its remaining causes of action when the Petition was granted by the trial court on the first cause of action—that the Amended BECSP was void—supports this was the sole relief that Kennedy sought. This is not evidence that this was the sole purpose of the litigation. Kennedy had successfully forced the City to provide adequate RHNA housing by voiding the Amended BECSP so there was no reason for Kennedy to pursue the matter until that decision was overturned by this court.

The City claims the fact that the lawsuit changed longstanding California law is irrelevant to determining a catalyst. This court's opinion resulted in the Legislature enacting SB 1333, a change in the law that eliminated the exemption for charter cities. The City relies on *Marine Forests Society v. California Coastal Com.* (2008) 160 Cal.App.4th 867 to support its claim that the change in the law does not matter in determining causation. In *Marine Forests,* the appellate court reversed an award of attorney fees to a nonprofit organization, which caused the law to be changed but whose primary goal in the litigation was to save an artificial reef (which it failed to do), not to obtain a change in the law. (*Id.* at pp. 878-879.)

We agree with the City that Kennedy's suit was not brought to effect a change in the law for charter cities. "[T]he plaintiff cannot be a successful party by obtaining just any relief. [Citation.] In catalyst cases, the plaintiff must show its lawsuit was a catalyst motivating the defendant to provide the primary relief sought in the litigation." (*Department of Water Resources Environmental Impact Cases* (2022) 79 Cal.App.5th

28

556, 572.)  The exemption of charter cities from the consistency requirement was not raised until the appeal of the Petition and was first raised by the City.

While this issue was not initially raised in the Petition and the FAP, it does not invalidate the finding by the trial court that there was a causal connection between the change in the law and the adoption of the Housing Element II.  The goal of Kennedy's litigation was to have the City meet its RHNA.  Government Code section 65583, which was applicable at the time the Petition was filed, required the City meet its RHNA even at the time of the filing of the Petition.  The litigation caused the Legislature to change the law to require consistency and prompted the HCD to file suit against the City.  Unlike in *Marine*, in which the sole goal of saving the reef was not achieved by the change in the law, here the change in the law led to the enactment of SB 1333.  This caused HCD to file its lawsuit.  In the face of the two lawsuits, the City finally adopted the Housing Element II in 2020, five years after they hired a consultant to amend the Housing Element.

Finally, the City insists that the clear intent of the City updating the Housing Element was to obtain SB-2 funding and not due to Kennedy's lawsuit.  Staff at the City Council's meetings did state on the record that the sole reason for implementing the Housing Element II was to obtain SB-2 funding.  However, the trial court could reasonably reject these assertions.  It was clear at the time these statements were made that the City was aware they were facing the prospect of attorney fees in this case.  The trial court could conclude such statements were made in order to avoid such fees in this case.

29

Moreover, the trial court could rely on the statements made by city council member Stephen Brenden, that the implementation of the Housing Element II should have been completed earlier in order to avoid litigation in this case. Further, the sole reason the City implemented the Housing Element II did not have to be the lawsuit. Kennedy only needed to show that the litigation was a " 'substantial factor' " in the change. (*Cates*, *supra*, 213 Cal.App.4th at p. 807.) Kennedy's persistence in requiring the City to meet its RHNA was a substantial factor in the adoption of the Housing Element II.

We conclude substantial evidence supports the trial court's finding that Kennedy met its burden of showing the causation element of the catalyst theory.

2.     *LAWSUIT WAS NOT FRIVOLOUS, UNREASONABLE OR*
         *GROUNDLESS*

In assessing this factor, the trial court must find that its result was achieved " 'by threat of victory, not by dint of nuisance and threat of expense.' [Citation.] The determination the trial court must make is not unlike the determination it makes when asked to issue a preliminary injunction, i.e., not a final decision on the merits but a determination at a minimum that ' "the questions of law or fact are grave and difficult." ' " (*Graham*, *supra*, 34 Cal.4th 553, at pp. 575-576.)

Here, the trial court properly concluded that the lawsuit was not frivolous. The City was required by state law to provide adequate housing for all income levels. (Govt. Code, § 65580.) Even though Kennedy did not prevail on the Petition on the first and second causes of action, it pursued the other causes of action in order to ensure that low-

30

income housing was provided for residents of Huntington. The trial court denied the City's demurrer to the FAP. Further, Kennedy voluntarily dismissed the FAP because the City finally had adopted the Housing Element II, which met its RHNA, recognizing that its objective had been met and that it need not continue litigation. The trial court could reasonably conclude that the Petition and the FAP were not "frivolous" or "groundless."

### 3. *PRELITIGATION SETTLEMENT*

The City contends that Kennedy did not reasonably attempt to settle the case before suing the City in 2015. The City insists that despite Kennedy contacting them prior to the filing of the Petition, it never stated that it would work with the City to find alternative solutions. Kennedy only wanted the City to invalidate the Amended BECSP and would not consider any other alternatives.

"[A] plaintiff seeking attorney fees under a catalyst theory must first reasonably attempt to settle the matter short of litigation." (*Graham*, *supra*, 34 Cal.4th at p. 577.) "Awarding attorney fees for litigation when those rights could have been vindicated by reasonable efforts short of litigation does not advance that objective and encourages lawsuits that are more opportunistic than authentically for the public good. Lengthy prelitigation negotiations are not required, nor is it necessary that the settlement demand be made by counsel, but a plaintiff must at least notify the defendant of its grievances and proposed remedies and give the defendant the opportunity to meet its demands within a reasonable time." (*Ibid*.)

31

On March 24, 2015, Kennedy sent a letter to Huntington's "Planning & Building" department. Kennedy sought clarification as to how the amended BECSP would impact the availability of low-income housing in Huntington. Kennedy provided that it looked forward to hearing from the city "and partnering with [Huntington] to achieve our mutually beneficially [*sic*] goals in creating more livable and economically competitive communities for all working families in [Huntington]." The same letter was sent on April 14, 2015, to other city officials. A letter was sent to the City on May 1, 2015, from Kennedy that no information regarding the impacts the Amended BECSP would have on the Housing Element had been received by Kennedy. Kennedy reiterated it wanted to partner with the City to facilitate the development of affordable homes.

On June 25, 2015, Kennedy sent a letter to the City after they adopted the Amended BECSP. Kennedy stated that it violated state law and was not consistent with the Housing Element of the general plan. The City should contact Kennedy to avoid judicial action. Kennedy assured the City that the letter was submitted in the "spirit of collaborating toward a shared goal of mitigating the impact of California's housing shortage on extremely low-, very low -, and low-income households." Kennedy hoped that the City would reinstate the BECSP sites. On July 8, 2015, the City responded that they had contacted a consultant to update the Housing Element. On July 17, 2015, Kennedy responded to the City that their response was inadequate. Kennedy had no choice but to pursue legal remedies. The Petition was filed on July 31, 2015.

Admittedly, evidence of the attempts made by Kennedy to settle this matter prior to filing the Petition is minimal. However, the trial court has broad discretion in

32

determining whether the factors are met to support the catalyst theory in awarding attorney fees pursuant to section 1021.5 and we can only reverse if the decision is clearly "wrong." (*County of Orange v. Barratt American, Inc.*, *supra*, 150 Cal.App.4th at p. 441.) The evidence does establish that Kennedy notified the City that the Amended BECSP violated state law and that it would seek judicial remedies if the City was not willing to discuss the issue. The City responded that they were hiring a consultant but gave no indication of a timeline. In fact, it took five years for them to adopt the Housing Element II. The trial court within its discretion could determine that Kennedy made reasonable efforts to settle the case by contacting the City and advising the City that it considered the Amended BECSP to be illegal and would take judicial action if nothing was done to meet its RHNA. (See *Grimsley v. Board of Supervisors* (1985) 169 Cal.App.3d 960, 966 ["before commencing his action, a 'private attorney general' such as plaintiff Grimsley, must be required reasonably to point out to the responsible county official or administrative or legislative body, such a claimed shortcoming of a general plan, thus to avoid litigation and substantial public expense"].) The trial court did not abuse its discretion in finding that Kennedy reached out to the City prior to filing their lawsuit and attempted to settle the matter. Based on the foregoing, Kennedy was a successful party under the catalyst theory.

        B.     <u>THE LAWSUIT MET THE STATUTORY</u> <u>REQUIREMENTS OF SECTION 1021.5</u>

The City also contends that Kennedy did not meet additional requirements of section 1021.5.

"Section 1021.5 authorizes an award of fees to a 'successful party' in 'any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." (*Friends of Spring Street v. Nevada City* (2019) 33 Cal.App.5th 1092, 1107; see also *Coalition for a Sustainable Future in Yucaipa v. City of Yucaipa*, *supra*, 238 Cal.App.4th at p. 520.) " ' "On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law." ' " (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1213.)

The City insists that Kennedy's motivation in filing the Petition and the FAP was to obtain a high attorney fee award and not to vindicate an important public right. Further, Kennedy provided no evidence that the litigation provided any public benefit.

First, the litigation vindicated an important right. "When determining whether a litigant has vindicated an important right affecting the public interest, '[t]he "judiciary [must] exercise judgment in attempting to ascertain the 'strength' or 'societal importance' of the right involved." [Citation.] "The strength or societal importance of a particular right generally is determined by realistically assessing the significance of that right in

34

terms of its relationship to the achievement of fundamental legislative goals." ' " (*City of*

*Oakland v. Oakland Police & Fire Retirement System* (2018) 29 Cal.App.5th 688, 710.)

" '[I]mportant rights" are not necessarily confined to any one subject or field."

(*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 935.)

"Courts have broadly interpreted the important right concept and 'frequently reject

attempts to characterize rights in their most narrow or personal light.' " (*Sweetwater*

*Union High School Dist. v. Julian Union Elementary School Dist.* (2019) 36 Cal.App.5th

970, 988.)

California has prioritized providing housing to all of its residents. "The availability

of housing is of vital statewide importance, and the early attainment of decent housing

and a suitable living environment for every Californian, including farmworkers, is a

priority of the highest order." (Gov. Code, § 65580, subd. (a).)  The litigation in this case

was brought to ensure that affordable housing was available in Huntington.  Further, the

litigation sought to ensure the City was conforming with state law, which was in the

public interest.  The prong of enforcing an important right was met.

Further, the litigation conferred a significant benefit.  "As for the significant

benefit to a large group that will justify an attorney fee award under section 1021.5, we

recently confirmed that such a benefit ' "need not represent a 'tangible' asset or a

'concrete' gain but, in some cases, may be recognized simply from the effectuation of a

fundamental constitutional or statutory policy." [Citation.]  In adjudicating a motion for

attorney fees under section 1021.5, a trial court should "determine the significance of the

benefit, as well as the size of the class receiving benefit, from a realistic assessment, in

light of all the pertinent circumstances, of the gains which have resulted in a particular case." ' " (*City of Oakland v. Oakland Police & Fire Retirement System*, *supra*, 29 Cal.App.5th at p. 710.)

In *La Mirada Avenue Neighborhood Assn. of Hollywood v. City of Los Angeles* (2018) 22 Cal.App.5th 1149, the plaintiffs brought an action against the City of Los Angeles regarding a decision made by the city council to grant Target Corporation eight variances from a zoning plan for a project. (*Id.* at pp. 1153-1154.) The plaintiffs stated they brought the action to ensure " 'that the City's decisions are in conformity with the requirements of the [municipal code].' " (*Id.* at p. 1157.) The trial court invalidated a number of the variances and the trial court awarded attorney fees to the plaintiffs finding that the litigation had conferred a significant benefit on residents of the City of Los Angeles. (*Id.* at p. 1155.) The appellate court upheld the award of attorney fees. It found, "The trial court did not abuse its discretion in ruling that plaintiffs' lawsuit conferred a significant benefit on the general public or a large class of persons. The chief benefit identified by the trial court—requiring the City to adhere to the Municipal Code's 'legal requirements' for granting variances from the [local zoning plan]—furthers a significant public policy. Our Supreme Court has consistently recognized the importance of 'preserv[ing] the integrity of' a 'locality's governing general plan' for zoning [citation], including through judicial oversight that 'prevent[s] unjustified variance awards' that threaten to 'subver[t] . . . the critical reciprocity upon which zoning regulation rests' [Citation.] What is more, the vindication of this significant policy benefits not only the persons living near the [proposed Target project] and the persons

36

living within the geographical boundaries of the [zoning area] at issue in this case, but also all residents of the City who benefit from the trial court's ruling that holds the City Council's zoning decisions to the letter and spirit of the municipal code." (*Id.* at pp. 1158-1159, fn. omitted.)

Here, the City had an RHNA for the planning period of 2013-2021 of 1,353 units. This was a significant amount of housing and its elimination impacted numerous lower-income residents. The litigation against the City was instrumental in the City adopting the Housing Element II, which conferred a significant benefit to residents in Huntington by assuring that development in Huntington included lower-income housing.[6] The litigation also encouraged the City to comply with state law. Finally, the litigation led to the enactment of SB 1333 even if it was not the primary objective of the litigation. This ensured that all charter cities in California would be subject to the consistency requirement that benefitted residents in all charter cities. The trial court did not abuse its discretion by finding that the litigation involved the enforcement of an important right and conferred a significant benefit on the public.

The City also contends that private enforcement by Kennedy was not necessary as they were working with the HCD in order to modify the Housing Element. Kennedy

---

[6] The City contends that Kennedy failed to provide specific and detailed evidence of the public benefit achieved in this case. The City provides no authority for its claim that Kennedy was required to present such evidence. This court can easily surmise the significant benefit of providing over 1,000 lower-income units and assuring that the City was following state law.

contends that the City never raised this issue in the trial court and has forfeited the argument.

In the Motion, Kennedy stated that private enforcement was necessary because the HCD did not file a lawsuit for three years. In their opposition to the Motion, the City argued that Kennedy's suit did not enforce an important public right or confer a significant benefit on the general public justifying attorney fees. The City made no argument that it was unnecessary for Kennedy to file the lawsuit as private enforcement was not necessary.

We find that the argument has been forfeited and will not address it. (See *City of Los Angeles v. Metropolitan Water Dist. of Southern California* (2019) 42 Cal.App.5th 290, 306 [failure to make argument in support of attorney fees award pursuant to section 1021.5 in the trial court forfeits the argument on appeal].)

C.     REASONABLENESS OF ATTORNEY FEES AWARD

The City contends even if Kennedy could be awarded attorney fees under section 1021.5, the trial court improperly awarded a lodestar of $2,522,286.50 based on 4,165.7 hours spent litigating the case. The City refers to the detailed bills submitted by Kennedy and contests the entries it claims were either duplicative, work that was not completed, or was unnecessary work.

"The California Supreme Court has instructed that attorney fee awards under section 1021.5 'should be fully compensatory,' and absent 'circumstances rendering the award unjust, an . . . award should ordinarily include compensation for all the hours *reasonably spent*.' " (*Cates*, *supra*, 213 Cal.App.4th at p. 820.) In determining the

38

amount of reasonable attorney fees to be awarded under a statutory attorney fees provision, the trial court begins by calculating the " 'lodestar' " amount. (*Graham*, *supra*, 34 Cal.4th at p. 579; *Ketchum v. Moses* (2011) 24 Cal.4th 1122, 1131.) The "lodestar" is "the number of hours reasonably expended multiplied by the reasonable hourly rate." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)

" 'California courts have long held that trial courts have broad discretion in determining the amount of a reasonable attorney's fee award. This determination is necessarily ad hoc and must be resolved on the particular circumstances of each case." [Citation.] In exercising its discretion, the trial court may accordingly 'consider all of the facts and the entire procedural history of the case in setting the amount of a reasonable attorney's fee award.' [Citation.] An attorney fees award ' "will not be overturned in the absence of a manifest abuse of discretion, a prejudicial error of law, or necessary findings not supported by substantial evidence." ' " (*Bernardi v. County of Monterey* (2008) 167 Cal.App.4th 1379, 1394.) In reviewing the trial court's exercise of its discretion, we also recognize that '[t]he "experienced trial judge is the best judge of the value of professional services rendered in his [or her] court, and while his [or her] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' " (*Ibid.*)

Here, the trial court stated that it had reviewed all of the billings "line-by-line." It found the hours were reasonable and "not outside those often expended in such protracted litigation." The evidence supporting the Motion included numerous declarations by the attorneys who handled the case. They provided detailed entries as to the amount of time

39

that was spent on the case.  Kennedy stated that the attorneys had already eliminated 500 hours spent on the case.  Further, Sobel attested that, based on the prevailing awards in this type of litigation, the rates charged by the attorneys were reasonable.  The trial court reviewed all the billings and determined they were reasonable.  We cannot find that such determination was " ' "clearly wrong." ' " (*Bernardi v. County of Monterey*, *supra*, 167 Cal.App.4th at p. 1394.)

Moreover, "It is well established that 'California courts do not require detailed time records, and trial courts have discretion to award fees based on declarations of counsel describing the work they have done and the court's own view of the number of hours reasonably spent.' " (*Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 698-699.)  The record contains not only the declarations of counsel as to the work performed in this case but also the detailed billing statements.  The trial court reviewed the detailed billings in this case and determined that they were reasonable.  "[T]he trial judge presided over the entire matter and was well able to evaluate whether the time expended by counsel in this case, given its complexity and other factors, was reasonable." (*Id.* at p. 700.)  The evidence was sufficient to support the trial court's finding that the number of hours expended was reasonable.  This court does not reweigh the evidence and we find that the trial court did not abuse its discretion in finding the hours requested were reasonable.

The City also contends the trial court could not award fees of $648,512.75 for work on the Petition because this court reversed those fees.  The City provides no authority for this argument.  Further, this court denied attorney fees but stated on remand

that Kennedy could argue the catalyst theory warranted the award of fees. Kennedy has argued as such, and we have found that Kennedy was properly awarded fees under this theory. The City also argues that Kennedy should not be paid for the unverified FAP. However, this argument was never made in the trial court. Further, the FAP was verified by Kennedy, raised numerous issues, and was only dismissed when the City finally adopted the Housing Element II. We reject this claim.

D.     MULTIPLIER

The City insists the trial court erred by awarding a multiplier of 1.4. A "multiplier" is a method by which the trial court can adjust the lodestar up or down. (*Mikhaeilpoor v. BMW of North America, LLC* (2020) 48 Cal.App.5th 240, 247-248.) "In determining whether to apply a multiplier to a lodestar amount, a court should consider all relevant factors, including: '(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award.' [Citation.] A court may rely on these factors to increase or decrease the lodestar. [Citation.] Any one factor may be sufficient to apply a positive or negative multiplier." (*Cates*, *supra*, 213 Cal.App.4th at p. 822.)

"The award of a multiplier is in the end a discretionary matter largely left to the trial court." (*Hogar Dulce Hogar v. Community Development Commission of City of Escondido* (2007) 157 Cal.App.4th 1358, 1371.) "We will not disturb the trial court's exercise of discretion in deciding whether to increase or reduce the lodestar figure unless the fee award is clearly wrong [citation], and we may 'presume the trial court considered

all the appropriate factors in choosing the multiplier and applying it to the whole lodestar.' " (*Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 384-385.)

Here, the trial court awarded the multiplier of 1.4 finding that "the legal struggle to prevail upon the City to enact measures to deal with the homelessness in and around its community required exceptional work by dedicated volunteer attorneys who employed their capabilities in the public interest over many years to finally attain a desired outcome." Kennedy's attorneys worked for the Public Interest Law Project, the PLC, Community Legal Aid SoCal and Jones Day law firm. These nonprofit organizations and law firm could have represented numerous other clients rather than perform work on the instant case for over five years. Further, this case involved complex issues regarding housing and conformance with state law, which took several years to resolve despite the City stating in 2015 they had plans to amend its Housing Element to comply with state law, but did not do so until February 2020. The trial court did not abuse its discretion by applying the 1.4 multiplier.

### E.     JUDGMENT

Finally, the City contends the trial court erred by entering judgment on August 23, 2021, because the City had already filed a notice of appeal and Kennedy had dismissed its claims. Initially, in the stipulation dismissing the FAP, Kennedy and the City expressly agreed that Kennedy could file a motion for attorney fees. It was reasonable for the City to be aware that such motion could result in a judgment against them for attorney fees.

42

Further, this court's docket does not reflect that the City filed their notice of appeal prior to the judgment being entered. The notice of appeal was filed on August 23, 2021, in case No. E078403. The docket reflects that it was served on August 23, 2021. Although the notice of appeal states that no judgment had been entered, the judgment in fact had been filed that day.[7] We reject the City's claim and find that the trial court properly entered judgment on August 23, 2021.[8]

## DISPOSITION

We affirm the award of attorney fees. Kennedy is awarded costs on appeal.

CERTIFIED FOR PUBLICATION

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

FIELDS
J.

---

**7** In their reply brief, the City contends the trial court ignored the fact it had filed its notice of appeal on August 23, 2021, when signing the judgment. This contradicts their claim in the opening brief that the notice of appeal was filed on August 20, 2021. Regardless, there is nothing to support that the notice of appeal was filed prior to the entry of the judgment on August 23, 2021.

**8** In the respondent's brief, Kennedy states it is aware that the interest awarded on the judgment is erroneous and will be corrected after the remittitur is issued in this case. In their reply brief, the City does not request that this court correct the interest on appeal and we will not do so.